734 P.2d 580

**Leta Fay FORD, a single woman, Plaintiff-Appellee,**

v.

**REVLON, INC., Defendant-Appellant.**

**No. CV 86–0148–PR.**

Supreme Court of Arizona, In Banc.

Feb. 24, 1987.

Reconsideration Denied April 21, 1987.

David F. Gomez, Phoenix, for plaintiff-appellee.

Allen, Kimerer & LaVelle by John V. Fels, Phoenix, and William H. Brown, III, Philadelphia, Pa., for defendant-appellant.

CAMERON, Justice.

This is a petition for review of a memorandum decision of the court of appeals which reversed a trial court judgment in petitioner Leta Fay Ford's favor. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 12–120.24 and Rule 23, Ariz.R.Civ.App.P., 17A A.R.S.

We granted the petition for review to consider three questions raised by Ford. Because of the disposition of the case, we find we need consider only two of these questions:

1. May an employer be held independently liable when its supervisor is found not guilty of intentional infliction of emotional distress?

2. May the failure of an employer to take appropriate action in response to an employee's complaints of sexual harassment by a supervisory employee constitute the tort of intentional infliction of emotional distress?

Although not considered by the court of appeals because its disposition made it unnecessary, the following questions were raised by the parties and briefed by them. We consider them now.

3. Is this matter controlled by Arizona's Workers' Compensation Act?

4. Is Ford entitled to attorney's fees?

## FACTS

Leta Fay Ford worked for the purchasing department of Revlon, Inc. (Revlon) in Phoenix, Arizona. She began her employment in 1973 as a secretary. She worked her way up to junior buyer and buyer positions over the ten years of her employment at Revlon. In October 1979, Revlon hired Karl Braun as the new manager for the purchasing department, which made him Ford's supervisor.

On 3 April 1980, Braun invited Ford to a dinner ostensibly to discuss business away from the office. Ford agreed and met Braun at a Phoenix restaurant. The business discussion, however, turned to more personal topics. At the end of the dinner, Ford started to leave. Braun told her that she was not going anywhere and to sit down because he planned to spend the night with her. When Ford rejected his advances, Braun told her, "you will regret

this." Ford testified at trial that after this incident her working relationship with Braun was strained and uncomfortable. Ford did not report the dinner incident nor the adverse working atmosphere to Revlon management.

On 3 May 1980, Revlon held its annual service awards picnic. Braun followed Ford for most of the day. At one point, Braun approached Ford as she was sitting on a picnic table with friends and put his face next to hers and said, "I want to fuck you, Leta." Ford replied, "never in a million years" to which Braun continued, "I am going to fuck you if it takes me ten years." Later that afternoon, as Ford and a friend were leaving the ladies room, Braun grabbed Ford and restrained her in a chokehold with his right arm, pulling Ford back a few steps. Braun ran his left hand over Ford's breasts, stomach, and between her legs. Braun repeatedly told Ford, "I want to fuck you. I am going to fuck you." As the struggle continued, Ford's friend intervened by yanking Braun's arm away which loosened his hold enough so that Ford could wrench herself free and run away.

Later in May of 1980, Ford began a series of meetings with various members of Revlon management to report her complaints. Ford first spoke with the Phoenix Revlon comptroller, Robert Lettieri, who had authority to recommend hiring, firing, discipline, and promotions. Ford told him about the incidents with Braun and that she was afraid of Braun and wanted help. Lettieri said that he would speak to someone in personnel about her complaint and that she also should talk to personnel.

In early June of 1980, Ford spoke to Cecelia Domin, the personnel manager for the clerical and technical group in the Phoenix plant. In the Revlon management hierarchy, Domin reported directly to the director of personnel and worked with the plant manager of executives. When meeting with Domin, Ford was very emotional, her hands were shaking, and she was crying. Ford told Domin about the incidents and said that she was afraid of Braun. On 23 June 1980, Ford spoke to Robert Kosci-usko, the personnel manager for executives. Ford also told him about the incidents, that she was afraid of Braun, and that the strain was making her sick.

In August of 1980, Ford met again with Domin and additionally with Martin Burstein, the director of personnel at the Phoenix plant. Again Ford complained about the incidents and told them that she was afraid of Braun. Burstein told Ford that he would talk to a Revlon vice president and that he would get back to her. Also in August, Ford spoke to John Maloney, a manager in receiving and stores. Maloney suggested that Ford contact Marie Kane at Revlon headquarters in New Jersey. Kane, a manager of human resources, was a "trouble shooter" and a veteran of the Phoenix personnel department.

In November of 1980, Ford telephoned Kane in New Jersey to report her concerns about Braun and her frustrations about the work situation. At this time, it had been six months since Ford first complained of Braun's conduct and no action had been taken. Kane then reported the details of her conversation with Ford to her boss, David Coe, the vice-president of industrial relations and operations. Kane also informed Coe that Ford was becoming ill because of the problem. Coe's response was that the matter was not their concern at the corporate level and that the matter should be sent back to the local level and handled in Phoenix. Coe instructed Kane to telephone Burstein so that he could solve the problem. Kane did speak to Burstein, who promised to take care of the problem immediately.

When, as of December 1980, no action had been taken on Ford's complaint, Ford telephoned Kane again and informed her that Braun was continuing his harassment by calling her into his office and telling her that he wanted to destroy her, that she made him nervous, and that so long as she worked for him she was never going to go anywhere. He also called her into his office and did not allow her to sit down and would stare at her and not speak to her. According to Ford, Kane responded that it was a lot to absorb and that she would

have to talk with someone else about it and that she would get back to Ford. After a few days had elapsed and Kane had not telephoned Ford, Ford again called Kane, who was out, and left a message. It was January 1981 before Kane returned Ford's call. Kane told Ford that the situation was too hot for her to handle and that she did not want to be involved. Kane suggested that Ford put the matter in the back of her mind and try to forget the situation.

Around this time, Ford also contacted Gene Tucker, a corporate Equal Employment Opportunity (EEO) specialist, and asked him for help. Tucker said that he would have to talk to Harry Petrie, the vice-president of industrial relations and personnel in New York. Tucker did not get back to Ford.

During the time of the harassment, Ford developed high blood pressure, a nervous tic in her left eye, chest pains, rapid breathing, and other symptoms of emotional stress. Ford felt weak, dizzy, and generally fatigued. Ford consulted a physician about her condition.

On 23 February 1981, Ford submitted a written request for a transfer out of the purchasing department. On 24 February 1981, Braun placed Ford on a 60–day probation because of her allegedly poor work performance. On 25 February 1981, a meeting finally was held in personnel at Ford's demand so she could have something done about her situation with Braun. Ford was able to have Tucker arrange a meeting with them and with Domin and Burstein. Ford again gave the details of her complaint against Braun and her fear of him. Ford also submitted a handwritten complaint which read in part:

I want to officially register a charge of sexual harassment and discrimination against K. Braun.

I am asking for protection from Karl Braun. I have a right to be protected.

I am collapsing emotionally and physically and I can't go on.

At this meeting on 25 February 1981, Braun was called in and confronted. After the meeting, Burstein and Domin told Ford that Braun would be closely monitored.

Burstein also testified that he investigated Ford's allegation, which he said took him about three weeks.

Not until three months later, on 8 May 1981, however, did Burstein submit a report on Ford's complaint to Vice-President Coe; the report confirmed Ford's charge of sexual assault and recommended that Braun be censured. On 28 May 1981, a full year and one month after Braun's initial act of harassment, Braun was issued a letter of censure from Revlon.

In October of 1981, Ford attempted suicide.

On 5 October 1981, Revlon terminated Braun. Braun testified at trial that the reason given him for his termination was that he did not fit into the Revlon organization, partially because of the way he handled the "Ford situation."

In April of 1982, Ford sued both Braun and Revlon for assault and battery, and for intentional infliction of emotional distress. At trial, two written personnel policies were admitted as evidence. One policy concerning employee complaints, which became effective as of 1 July 1976, provided in part the following:

I. *Policy*

Any employee who has a complaint about any aspect of his or her employment is entitled to have the complaint heard, investigated and, if possible, resolved.

    \*     \*     \*     \*     \*     \*

II. *Procedure*

    \*     \*     \*     \*     \*     \*

C. Legitimate complaints are to be satisfied as promptly and as fully as possible. When a complaint is not valid, or when the resolution would require an unwarranted breach of company policy or precedent, then the employee must nevertheless be given a prompt explanation of the circumstances which make it impossible for the company to satisfy the complaint.

The second policy, effective as of 16 April 1981, defined sexual harassment in accordance with the Equal Employment Opportu-

nity Commission (EEOC) guidelines and provided that personnel executives who were made aware of allegations of sexual harassment

> are responsible for investigating the allegations promptly, fully and with the highest degree of confidentiality and for taking other appropriate personnel actions to deal with alleged violations or for referring them to higher authority for disposition.

The jury found Braun liable for assault and battery but not liable for intentional infliction of emotional distress. The jury found Revlon liable for intentional infliction of emotional distress but not liable for assault and battery. Damages awarded to Ford by the jury were assessed against Braun in the amount of $100 compensatory damages and $1,000 punitive damages, and assessed against Revlon in the amount of $10,000 compensatory damages and $100,-000 punitive damages. Only Revlon appealed. Therefore, the only issue on appeal was whether Revlon was liable for intentional infliction of emotional distress. The court of appeals in a memorandum decision reversed the judgment of the trial court, holding that since Braun (as agent) was found not guilty of intentional infliction of emotional distress, then Revlon (as principal) could not be found guilty. We granted review because we disagreed with this limitation on the liability of Revlon.

### INDEPENDENT TORT LIABILITY OF THE EMPLOYER

The court of appeals held that Revlon could not be liable for intentional infliction of emotional distress if Braun was not liable. The court of appeals stated:

> Even though the jury found Braun did assault Ford on May 3, 1980, it found that the assault and his subsequent acts, whatever they were found to be, were insufficient to hold him liable for intentional or reckless infliction of emotional distress. Revlon's liability is inextricably tied to the acts of Braun. Since Braun's acts did not constitute intentional or reckless infliction of emotional distress, then the inaction of Revlon on Ford's

complaint certainly could not reach that level.

■ We disagree. Admittedly, when the master's liability is based solely on the negligence of his servant, a judgment in favor of the servant is a judgment in favor of the master. *DeGraff v. Smith*, 62 Ariz. 261, 157 P.2d 342 (1945). When the negligence of the master is independent of the negligence of the servant, the result may be different. As noted by the court of appeals:

> We recognize that where there is independent negligence on the part of the master, the master may be liable, apart from his derivative liability for his servant's wrongful acts. *Siebrand v. Gossnell*, 234 F.2d 81 (9th Cir.1956); *First National Bank v. Otis Elevator Co.*, 2 Ariz.App. 80, 406 P.2d 430 (1965), opinion on rehearing, 2 Ariz.App. 596, 411 P.2d 34 (1966). In such a case, a judgment in favor of the servant will not ordinarily bar a recovery against the master. However, the master must have " 'been guilty of acts on which *independently of the acts of the servant*, liability may be predicated.' "
>
> (Emphasis supplied). *DeGraff v. Smith*, 62 Ariz. 261, 266, 157 P.2d 342, 344 (1945).

*Torres v. Kennecott Copper Corporation*, 15 Ariz.App. 272, 274, 488 P.2d 477, 479 (1971).

■ We believe that the analysis should be the same in intentional tort cases. In a case factually similar to this one, the U.S. Court of Appeals for the Fourth Circuit recognized that a corporation could be liable for intentional infliction of emotional distress because its supervisor was aware of the sexual harassment of an employee by a manager and failed to stop it even though the *underlying* harassment might not rise to the level of either assault and battery or intentional infliction of emotional distress. *Davis v. United States Steel Corp.*, 779 F.2d 209, 211 (4th Cir.1985). The Fourth Circuit held that although the acts and behavior of the manager were despicable, they did not rise to the level of providing a basis for recovery by the com-

plainant against the corporation for assault and battery or intentional infliction of emotional distress. The court went on to say, however, that "the situation is otherwise with respect to [the employer] and [its] failure to take any action." *Id.* at 212. We believe that Revlon's failure to investigate Ford's complaint was independent of Braun's abusive treatment of Ford. Annotation, *Liability of Employer, Supervisor, or Manager for Intentionally or Recklessly Causing Employee Emotional Distress,* 86 A.L.R.3d 454, 457 (1978).

### IS REVLON LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS?

The Restatement of Torts recognizes that conduct which is extreme and outrageous may cause severe emotional distress for which one may be subject to liability. Restatement (Second) of Torts § 46(1) (1965). The Restatement also states that the tort of emotional distress inflicted intentionally or recklessly is recognized as a separate and distinct basis of tort liability. There is no need to show elements of other torts such as assault and battery. Restatement (Second) of Torts § 46 comment b (1965). A comment to § 46 states that there is liability:

> where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community ... in which ... an average member of the community would ... exclaim, "Outrageous!"

*Id.* comment d. We have followed this standard for liability. *See, e.g., Continental Life & Acc. Co. v. Songer,* 124 Ariz. 294, 603 P.2d 921 (App.1979); *Rosales v. City of Eloy,* 122 Ariz. 134, 593 P.2d 688 (App.1979); *see also Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 619 P.2d 1032 (1980); *accord Stewart v. Thomas,* 538 F.Supp. 891 (D.D.C.1982).

More specifically, intentional infliction of emotional distress is often based upon claims of sexual harassment, 1 L. Larson, *Employment Discrimination* § 41.67(b),

at 8–148 (1984). The failure of an employer to promptly investigate complaints of sexual harassment is significant in making a determination to impose liability on an employer for its supervisors' acts of sexual harassment. B. Schlei & P. Grossman, *Employment Discrimination Law* 427 (2d ed. 1983).

Elements of the tort of intentional infliction of emotional distress have been set out by this court, relying upon the language of the Restatement of Torts. *Savage v. Boies,* 77 Ariz. 355, 272 P.2d 349 (1954). The three required elements are: *first,* the conduct by the defendant must be "extreme" and "outrageous"; *second,* the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and *third,* severe emotional distress must indeed occur as a result of defendant's conduct. *Watts v. Golden Age Nursing Home,* 127 Ariz. at 258, 619 P.2d at 1035. *Accord Lucchesi v. Stimmel,* 149 Ariz. 76, 78–9, 716 P.2d 1013, 1015–16 (1986).

We believe that the conduct of Revlon met these requirements. First, Revlon's conduct can be classified as extreme or outrageous. Ford made numerous Revlon managers aware of Braun's activities at company functions. Ford did everything that could be done, both within the announced policies of Revlon and without, to bring this matter to Revlon's attention. Revlon ignored her and the situation she faced, dragging the matter out for months and leaving Ford without redress. Here is sufficient evidence that Revlon acted outrageously.

Second, even if Revlon did not intend to cause emotional distress, Revlon's reckless disregard of Braun's conduct made it nearly certain that such emotional distress would in fact occur. Revlon knew that Braun had subjected Ford to physical assaults, vulgar remarks, that Ford continued to feel threatened by Braun, and that Ford was emotionally distraught, all of which led to a manifestation of physical problems. Despite Ford's complaints, Braun was not confronted for nine months,

and then only upon *Ford's* demand for a group meeting. Another three months elapsed before Braun was censured. Revlon not only had actual knowledge of the situation but it also failed to conduct promptly any investigation of Ford's complaint.

Third, it is obvious that emotional distress did occur. Ample evidence, both medical and otherwise, was presented describing Ford's emotional distress. Ford testified about her emotional distress and her development of physical complications caused by her stressful work environment. The evidence convinced the jury, which found that emotional distress had occurred.

■ We also note that Revlon had set forth a specific policy and several guidelines for the handling of sexual harassment claims and other employee complaints, yet Revlon recklessly disregarded these policies and guidelines. Ford was entitled to rely on the policy statements made by Revlon. *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). Once an employer proclaims a policy, the employer may not treat the policy as illusory. *Leikvold v. Valley View Community Hosp.*, 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984) (suit by at-will employee against employer for breach of employment contract and defamation). We hold that Revlon's failure to take appropriate action in response to Ford's complaint of sexual harassment by Braun constituted the tort of intentional infliction of emotional distress.[1]

## ARIZONA WORKER'S COMPENSATION LAW

■ Revlon contends that this matter is controlled by Arizona Workers' Compensation laws and not by tort law. We disagree. Ford's severe emotional distress injury was found by the jury to be not unexpected and was essentially nonphysical in nature. As the trial court stated:

Evidence established that this tort was committed through defendant's action and inaction to plaintiff's complaints made over a period in excess of eight months. Such action and inaction and the resulting emotional injury to the plaintiff were therefore not "unexpected," accidental, or physical in nature so as to limit plaintiff's recovery to the workmen's compensation claim under A.R.S. §§ 23–1021(B) and 1043.01(B).

*Ford v. Revlon, Inc.*, No. C–457854, slip op. at 15 (Super.Ct. Maricopa County, June 15, 1984). A.R.S. § 23–1021(B) provides, in relevant part, that

Every employee covered by insurance in the state compensation fund who is injured *by accident* arising out of and in the course of employment ... shall be paid such compensation....

(Emphasis added). A.R.S. § 23–1043.01(B) sets forth the limiting standard for compensation under the statute for physiological injury. This section states: "A mental injury ... shall not be considered a personal injury by accident ... and is not compensable ... unless ... unexpected, unusual or extraordinary stress ... or some physical injury ... was a substantial contributing cause."

The acts by Braun and Revlon were not "accidents." Indeed, the jury found both parties liable for the intentional offenses in which they engaged: Braun for assault and battery and Revlon for emotional distress. An injured employee may enforce common-law liability against his or her employer if not encompassed by statute. *Twohy Bros. Co. v. Rogers*, 293 F. 566 (9th Cir.1923).

## ATTORNEY'S FEES

■ Cases which involve extreme and outrageous intentional invasions of an individual's "mental and emotional tranquility" allow recovery solely for the emotional distress absent any consequential physical in-

---

1. Concurrent with her state tort claim, Ford filed a federal Title VII claim based upon the same facts; Revlon contends that the dual filing is inappropriate. As the trial court noted, the exercise of dual jurisdiction in federal Title VII and state tort claims is entirely appropriate.

*Guyette v. Stauffer Chemical Co.*, 518 F.Supp. 521 (D.N.J.1981); *Stewart v. Thomas, supra.* We find no error in bringing the action in both state and federal courts based upon two separate and distinct causes of action.

juries. *Alcorn v. Anbro Engineering Inc.,* 2 Cal.2d 493, 499, 468 P.2d 216, 218, 86 Cal.Rptr. 88, 90 (1970). In Arizona, an action in tort for personal injuries may be brought where a complainant can establish a breach of a duty and injuries proximately caused by the breach. *Maldonado v. Southern Pacific Transp. Co.,* 129 Ariz. 165, 629 P.2d 1001 (App.1981). The jury in the instant case properly decided and awarded damages and costs.

■ The trial judge awarded attorney's fees to Ford pursuant to statute, which reads:

§ 12–341.01. **Recovery of attorney's fees**

A. In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees.

\* \* \* \* \* \*

D. Reasonable attorney's fees awarded under the provisions of this section shall be awarded by the court and not by a jury.

This statute allows attorney's fees only in the case of breach of contract, express or implied. In the instant case, the tort of intentional or reckless conduct was based in part on the violation of the policies and procedures concerning employee complaints adopted by Revlon and which amounted to an implied contract between Revlon and its employees.

Our court of appeals has stated:

In our opinion this issue is controlled by *Sparks v. Republic National Life Ins. Co.,* 132 Ariz. 529, 647 P.2d 1127 (1982). In *Sparks* an action was brought by an insured against their insurer alleging in part a bad faith denial of insurance coverage, a tort. After specifically disavowing the holding in *Amphitheater Public Schools v. Eastman,* 117 Ariz. 559, 574 P.2d 47 (App.1977), the court held that the test to be applied in determining whether the "arising out of contract" language of A.R.S. § 12–341.01 is applicable is whether the "action in tort could not exist *but for* the breach of the contract." 647 P.2d at 1141. (emphasis in original). If this test is met, attor-

ney's fees are awardable under the statute.

Trebilcox's cause of action in tort was for breach of a fiduciary relationship arising out of an attorney-client contract. Implicit in that action was the existence of an attorney-client relationship based upon the contract and a breach of the contractual duty to exercise the utmost honesty, good faith, fairness, integrity and fidelity to the client. *Parsons v. Continental National American Group,* 113 Ariz. 223, 550 P.2d 94 (1976). It is thus clear that the Trebilcox cause of action for tort could not exist but for the breach of the attorney-client contract. Under such circumstances attorney's fees are available under A.R.S. § 12–341.01.

*Trebilcox v. Brown & Bain,* 133 Ariz. 588, 591, 653 P.2d 45, 48 (App.1982).

In the instant case, the tort of intentional infliction of emotional distress could not exist but for the breach of the contract implied by the policies and procedures announced by Revlon. The breach by Revlon of its own policies and procedures was part of the basis for the tort.

We concur with the trial court on the issue of attorney's fees:

[T]he award of attorney's fees to the plaintiff was based on the breach of an implied contract between the plaintiff and defendant, but for which the tort would have not occurred ... the award of attorney's fees is authorized pursuant to A.R.S. § 12–341.01(A), Rule 54(d), Rules of Civil Procedure, and *Trebilcox v. Brown and Bain,* 133 AZ 588 [653 P.2d 45] (1982).

We agree. *See also Wagenseller, supra.*

The decision of the court of appeals is vacated. The judgment of the trial court is reinstated.

GORDON, C.J., and JACK D.H. HAYS, Retired J., concur.

FELDMAN, Vice Chief Justice, concurring.

I reach the same result, but write separately because I do not agree with the

court's analysis on the issue of whether the Arizona workers' compensation law bars Ford from tort recovery. 153 Ariz. at 44–45, 734 P.2d at 586–587. The court concludes that Ford may recover in tort for her injuries because they were not caused "by accident" within the meaning of the workers' compensation scheme. *See* A.R.S. §§ 23–1021(B) and 23–1043.01(B). To support its analysis, the court notes that Ford's injuries were "essentially nonphysical" and "not unexpected." At 44, 734 P.2d at 586. In fact, the court adds, the jury found Revlon liable for *intentional* infliction of emotional distress. *Id.* at 45, 734 P.2d at 587.

The court errs in its attempt to narrow the definition of "accident." Under both the Arizona Constitution and precedent, Ford's injuries were the result of "accident" and do fall within the coverage formula. Thus, she may recover in tort only if the action for intentional infliction of emotional distress is one of those torts outside the purpose and intent of the workers' compensation scheme. *See Renteria v. County of Orange*, 82 Cal.App.3d 833, 841, 147 Cal.Rptr. 447, 451 (1978) (some types of torts fall within "an entire class of civil wrongs outside the contemplation of the workers' compensation system"), followed in *Russell v. Massachusetts Mutual Life Insurance Co.*, 722 F.2d 482, 493–95 (9th Cir.1983), *rev'd in part on other grounds*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Garvin v. Shewbart*, 442 So.2d 80, 83 (Ala.1983) (conduct constituting intentional infliction of emotional distress cannot be considered to be within

the scope of the workers' compensation act); *cf.* 2A A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 68.30, at 13–40 (1983).

## I.

The Arizona Constitution directs the legislature to enact a workers' compensation law protecting workers injured or killed "from any accident arising out of and in the course of" employment. Ariz. Const. art. 18, § 8.[1] This constitutional requirement arose from the view that work-related injury was an inevitable accompaniment of industrialization, the costs of which should be borne by the responsible industry and its consumers. *Pressley v. Industrial Commission*, 73 Ariz. 22, 236 P.2d 1011 (1951); *Atkinson, Kier Brothers, Spicer Co. v. Industrial Commission*, 35 Ariz. 48, 53–54, 274 P. 634, 636 (1929): Note, *Exceptions to the Exclusive Remedy Requirements of Workers' Compensation Statutes*, 96 HARV.L.REV. 1641, 1642 (1983). The workers' compensation acts thus were intended to shift the cost of industrial accidents from the injured employees to industry. Note, *Mental Injury and the Workmen's Compensation Act*, 19 ARIZ.L. REV. 709, 710 (1977); W. PROSSER & W. KEETON, THE LAW OF TORTS § 80, at 572–74 (5th ed. 1984). Industry, in turn, spread the cost of employee accidents among consumers through the increased cost of goods and services. Note, *supra*, 19 ARIZ.L.REV. at 710; W. PROSSER & W. KEETON, *supra* § 80, at 573.

---

1. At the time of the Arizona Constitutional Convention of 1910, legislatures around the country were enacting such statutes in response to the increased financial burden placed on society by victims of industrial accidents; industrial towns found themselves supporting numerous workers' families after the workers had been maimed or killed while working. Note, *Intentional Torts Under Workers' Compensation Statutes: A Blessing or a Burden?* 12 HOFSTRA L.REV. 181, 181 (1983); Note, *Exceptions to the Exclusive Remedy Requirements of Workers' Compensation Statutes*, 96 HARV.L.REV. 1641, 1641 (1983). Injured workers rarely sued for work-related injuries because a great majority of the suits were unsuccessful. *Atkinson, Kier Brothers, Spicer Co. v. Industrial Commission*, 35 Ariz. 48, 53–54,

274 P. 634, 636 (1929); Note, *supra*, 12 HOFSTRA L.REV. at 182; Note, *supra*, 96 HARV.L. REV. at 1641; W. PROSSER & W. KEETON, THE LAW OF TORTS § 80, at 572 and n. 43 (5th ed. 1984) (70 percent to 94 percent uncompensated). This was so because employees had not only to prove the employer's fault, which was often impossible because the injury resulted from a risk inherent in the type of employment, but also because employers asserted the common law defenses of contributory negligence, assumption of risk, and the fellow-servant rule. Note, *supra*, 12 HOFSTRA L.REV. at 181–83; Note, *supra*, 96 HARV.L.REV. at 1644; W. PROSSER & W. KEETON, *supra* § 80, at 568–72.

In Arizona, the evolution of workers' compensation case law strikingly illustrates the manner in which, by *expanding* the concept of "accident," the courts strained to realize these social goals. *See, e.g., Goodyear Aircraft Corp. v. Industrial Commission,* 62 Ariz. 398, 158 P.2d 511 (1945); *Matter of Mitchell,* 61 Ariz. 436, 451, 150 P.2d 355, 361 (1944). At first, the term "accident" was narrowly construed by giving it the common meaning of a "sudden or instantaneous act or occurrence." *Pierce v. Phelps Dodge Corp.,* 42 Ariz. 436, 26 P.2d 1017 (1933). *Mitchell* expanded "accident" to include a gradual and progressive injury. The courts then adopted the view that an injury resulted from an "accident" when either the external cause was unexpected or the resulting injury was unintended. *Paulley v. Industrial Commission,* 91 Ariz. 266, 272, 371 P.2d 888, 893 (1962).

This background illustrates the error of the court's analysis. The court finds that Revlon's conduct was not an "accident," presumably because Revlon acted intentionally and, therefore, its conduct was not "unexpected." In so holding, the court has ignored this state's extremely expansive definition of "accident" for workers' compensation purposes. *Fireman's Fund Insurance Co. v. Industrial Commission,* 119 Ariz. 51, 579 P.2d 555 (1978) (mental breakdown caused by stress of work is an injury by accident); *Paulley, supra.* Under Arizona's case law and statutes, an "accident" is any work-connected injury between the extremes of a "purposely self-inflicted" injury (A.R.S. § 23–1021) and one inflicted by the employer acting "knowingly and purposely with the direct object of injuring" the employee. *See Johnson v. Kerr-McGee Oil Industries, Inc.,* 129 Ariz. 393, 631 P.2d 548 (App.) (the intentional injury exception does not apply even when the employer deliberately and intentionally exposes an employee to a known risk of harm), *appeal dismissed,* 454 U.S. 1025, 102 S.Ct. 560, 70 L.Ed.2d 469 (1981); *accord Kofron v. Amoco Chemicals Corp.,* 441 A.2d 226 (Del.1982). If cancer caused by the employer's deliberate exposure of unprotected employees to a known carcinogen is an "accidental injury" (*Kerr-McGee, supra*), it is difficult to understand how the mental trauma caused by an employer's deliberate failure to respond to an employee's complaints of sexual harassment can be nonaccidental.

In holding that Ford's injuries were not accidental, the court has failed to consider or discuss the limited exceptions to the exclusivity bar of the workers' compensation statutes. This scheme of coverage extends to all work-related injuries except those that are purposely self-inflicted and those intentionally inflicted by the employer. *See* A.R.S. §§ 23–1021(B), 23–1022, and 23–1043.01(B); Ariz. Const. art. 18, § 8. The majority implies that Ford's action cannot be barred because the jury found the employer liable for "*intentional* infliction of emotional distress." At 45, 734 P.2d at 587. However, the jury's finding does not bring Ford within the intentional act exception; that exception applies only to employers who "knowingly or purposely" act with the "direct object of injuring" the employee. Ariz. Const. art. 18, § 8; A.R.S. § 23–1022. The trial evidence does not warrant an inference that Revlon had the "direct object of injuring" Ford and neither it nor its elected officers (*see* A.R.S. § 23–1022) could have had any possible motive for such an objective. Ford's verdict against Revlon is sustainable only on the theory that Revlon recklessly disregarded the near certainty that emotional distress would result from its failure to respond to Ford's complaints. *See Lucchesi v. Stimmell,* 149 Ariz. 76, 78–79, 716 P.2d 1013, 1015–16 (1986). Such a reckless disregard falls far short of a knowing or purposeful act committed with the "direct object of injuring" Ford. Ariz. Const. art. 18, § 8; *Kerr-McGee, supra.* The intentional infliction finding, therefore, does not remove Ford's injury from the exclusivity bar.

## II.

Despite my disagreement with the court's analysis, I concur in the result. Although Ford's *injury* falls within the workers' compensation coverage formula, she still should be allowed to obtain tort recov-

ery because the *wrong* done her falls outside the workers' compensation scheme.

The original purpose of workers' compensation was to compensate workers for injury that had its origin in a risk connected with the employment. *Ocean Accident & Guarantee Corp., Ltd. v. Industrial Commission,* 32 Ariz. 265, 270-71, 257 P. 641, 642-43 (1927); *Netherton v. Lightning Delivery Co.,* 32 Ariz. 350, 258 P. 306 (1927). This purpose is expressed in the language of the Arizona Constitution providing that the legislature enact workers' compensation laws requiring compensation

> if in the course of such employment personal injury to or death of any such workman from any accident arising out of and in the course of, such employment, *is caused in whole, or in part, or is contributed to, by a necessary risk or danger of such employment, or a necessary risk or danger inherent in the nature thereof ...*

Ariz. Const. art. 18, § 8 (emphasis added). The risks contemplated by the drafters of the constitution and by the bulk of the public as the purpose behind workers' compensation are "[a]ll the things that can go wrong around a modern factory, mill, mine, transportation system, or construction project—machinery breaking, objects falling, explosives exploding, tractors tipping, fingers getting caught in gears, excavations caving in, and so on...." 1 A. LARSON, *supra* § 7.10, at 3-12 (1985).

Courts have considered the original intent of the workers' compensation scheme and some have provided a tort remedy instead of workers' compensation to employees injured by wrongs that are not "a necessary risk or danger" of their employment. Some courts have invoked the bar of exclusivity and have refused to recognize a tort remedy. Cases that reflect this struggle over exclusivity include: *Ritter v. Allied Chemical Corp.,* 295 F.Supp. 1360 (D.S.C.1968) (assault), *aff'd,* 407 F.2d 403 (4th Cir.1969); *Franks v. United States Fidelity & Guaranty Co.,* 149 Ariz. 291, 718 P.2d 193 (App.1985) (bad faith claim against compensation carrier); *Iverson v. Atlas Pacific Engineering,* 143 Cal.App.3d 219, 191 Cal.Rptr. 696 (App.1983) (false imprisonment); *Howland v. Balma,* 143 Cal.App.3d 899, 192 Cal.Rptr. 286 (App.1983) (slander); *Travelers Insurance Co. v. Savio,* 706 P.2d 1258 (Colo.1985) (bad faith); *Battista v. Chrysler Corp.,* 454 A.2d 286 (Del.Super.Ct.1982) (intentional infliction of emotional distress and defamation); *Gallagher v. Bituminous Fire & Marine Insurance Co.,* 303 Md. 201, 492 A.2d 1280 (1985) (intentional infliction of emotional distress); *Foley v. Polaroid Corp.,* 381 Mass. 545, 413 N.E.2d 711 (1980) (defamation); *Boscaglia v. Michigan Bell Telephone Co.,* 420 Mich. 308, 362 N.W.2d 642 (1984) (civil rights); *Moore v. Federal Department Stores, Inc.,* 33 Mich.App. 556, 190 N.W.2d 262 (1971) (false imprisonment); *but see Baker v. Wendy's of Montana, Inc.,* 687 P.2d 885 (Wyo.1984) (intentional infliction of emotional distress and assault).

The leading commentator in the field notes that when no physical injury has been suffered, and thus "[w]hen no compensation remedy is available, these tort actions fall squarely within the broad class of cases ... which do not come within the fundamental coverage pattern of the Act at all...." 2A A. LARSON, *supra* § 68.30, at 13-40. Larson would allow the employee to recover outside the workers' compensation system under the following conditions:

> If the essence of the tort, in law, is non-physical, and if the injuries are of the usual non-physical sort, with physical injury being at most added to the list of injuries as a makeweight, the suit should not be barred. But if the essence of the action is recovery for physical injury or death, the action should be barred even if it can be cast in the form of a normally non-physical tort.

*Id.* § 68.34(a), at 13-62 to 13-63.

I believe Professor Larson's analysis is essentially correct, except that instead of focusing on the nature of the injury in each particular case, I would look to the essential nature of the wrong in question. Regardless of the label placed on the action, it is outside the workers' compensation scheme only if the wrong is one not ordi-

narily resulting from an inherent risk or danger of the employment and if the essence of the tort action ordinarily is nonphysical with physical injury only incidental to emotional, mental, or other injury. Among these types of torts and actions, as Professor Larson and some cases recognize, are defamation, invasion of privacy, false imprisonment, sexual, religious or racial discrimination, wrongful termination, constitutional torts, and similar matters. *See* 2A A. LARSON, *supra* §§ 68.30–68.-34(e), at 13–39 to 13–80 and Supp.1985.

Under the facts of this case, I believe the tort committed by Revlon was outside the coverage of the workers' compensation act and thus the action is not barred by the doctrine of exclusivity. The essence of the wrong was sexual harassment. Revlon failed to react to Ford's complaints, in reckless disregard of the consequences, thus making itself liable for outrageous conduct. While the form of the action—intentional infliction of emotional distress—is not always outside workers' compensation (*see Gallagher, supra*, and *Foley, supra*), the essence of the tort in the case before us involves a violation of rights protected by law and policy. *See* 42 U.S.C.A. § 2000e-2(a)(1); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). By law, exposure to sexual harassment is not an inherent or necessary risk of employment, even though it may be or may have been endemic. The cost of such conduct ought not to be included in the cost of the product and passed to the consumer. If my employer invades my right to privacy by tapping my telephone, it is my employer who should pay the piper for such a wrong, not his compensation carrier.

Given the substantive nature of the wrong committed here, I believe that this form of the action falls outside the compensation system. The action for outrage, now called infliction of emotional distress, was first recognized as a remedy for emotional injury caused by outrageous conduct and as a response to the doctrine that, unaccompanied by preceding physical harm, such injury was noncompensable. *See* W. PROSSER & W. KEETON, *supra* § 12, at 54–56. Thus, I believe Ford is entitled to maintain a tort action against her employer despite the exclusivity bar for the simple reason that her injury ought not to be compensable under the workers' compensation system and is one of those torts that ought to be compensable only at the expense of the wrongdoer and only upon a showing of the requisite degree of culpability.

HOLOHAN, J., concurs.