Robert Dale MARTIN,
Plaintiff–Counterdefendant–Appellant,

v.

Deborah D. BAER, et al.,
Defendants–Counterclaimants,

United Automobile Workers Union, Local
323, Gerald R. Rhoden, International
Union, United Automobile Workers Un-
ion, Defendants,

General Motors Corporation,
Defendant–Appellee.

No. 90–3230.

United States Court of Appeals,
Eleventh Circuit.

April 17, 1991.

Alan Michael Foody, Noe & Eakin, Atlan-
tic Beach, Fla., for plaintiff-counterdefen-
dant-appellant.

Gavin S. Appelby, Paul T. Stagliano,
Paul, Hastings, Janofsky, & Walker, Atlan-
ta, Ga., for defendant-appellee.

Before FAY and JOHNSON, Circuit
Judges, and PECK, Senior Circuit
Judge *.

FAY, Circuit Judge:

Plaintiff-appellant Robert Dale Martin
appeals an order granting summary judge-
ment in favor of defendant-appellee Gener-
al Motors Corporation ("GM"). Martin

* Honorable John W. Peck, Senior U.S. Circuit
Judge for the Sixth Circuit, sitting by designa-
tion.

claims that the district court erred in failing to find under Fed.R.Civ.P. 56(c) that any genuine issues of material fact existed in connection with three counts in Martin's complaint seeking relief from GM for "Breach of Contract," "Infliction of Emotional Distress," and "Tortious Nonfeasance and Excessive Publication of Slanderous Statements." Because we agree with the district court that no material fact issues exist in relation to any of these claims, we AFFIRM the order of summary judgment in favor of GM.

## I. FACTS

Appellant Martin was initially hired by GM in 1961 as an hourly employee at GM's Chevrolet National Parts Distribution Facility in Flint, Michigan (now referred to as a Service Parts Organization ("SPO") facility). In 1964, Martin was promoted to a supervisory position, and purportedly[1] signed a standard form employment agreement.[2] Except for approximately two years in the late 1970's when he was employed in a planning capacity, Martin remained a level six supervisor for the rest of his GM career.[3]

1. The employment agreement, dated March 1, 1964, appears to be signed by Martin. Martin claims that he does not remember signing the agreement, and that there is a factual dispute over the authenticity of his signature. Nevertheless, he does not explicitly deny signing the document, and admits that it is "possible" that he did so. (*Deposition of Robert Dale Martin,* Vol. VII, at 1621).

2. The agreement was a GM standard form employment agreement, with the name "Chevrolet Flint Manufacturing Division" stamped in the blank indicating the GM division with which Martin had entered into agreement. According to Lovina Springer, a Human Resources Coordinator of the SPO facility in Flint, Michigan, who has been employed with GM since 1972, the agreement is "the standard form agreement that is signed by all exempt personnel employed by General Motors Corporation, whether employed in the Service Parts Organization, the Chevrolet Flint Manufacturing Division, or any other division" of GM. (*Affidavit of Lovina Springer,* R7–177). Because Martin worked for the Parts Distribution facility, however, and not the Manufacturing Division, he contends that the technical discrepancy precludes GM from enforcing

In 1984, Martin requested and was granted a transfer from GM's Flint, Michigan SPO facility to a similar parts facility in Jacksonville, Florida. Martin alleges that the leadership of Local 323 of the United Automobile Workers, which represents the hourly production employees at GM's Jacksonville facility, began to create and disseminate rumors about him shortly after his arrival in Jacksonville. According to Martin, the first rumor that surfaced in 1984 was that he was a homosexual. The rumor was allegedly part of an organized union "smear campaign" to undermine Martin's supervisory authority, or to have him discharged from GM's Jacksonville facility. Martin contends that this alleged "smear campaign" was similarly the source of two additional rumors spread about him some time around the spring of 1985: that he was having sexual relations with several women in the facility, and that he was attempting to buy or sell illegal drugs. According to GM, the vagueness of the rumors made them difficult to evaluate. Nevertheless, GM promptly investigated the rumors of buying and selling drugs after specific charges were alleged. The investigation failed to uncover any facts to support the allegations, and GM found no basis for pursuing the matter further.[4]

any provisions of the employment agreement against him.

3. According to GM, a "level six" supervisor is GM's first-level foreman position. Such persons generally supervise a group of hourly employees at an SPO facility.

4. Specifically, the Union Shop Committee Chairman Gerald Rhoden informed GM management that Martin had attempted to buy and sell drugs to hourly employee Deborah (Simpson) Baer. GM sent security personnel from both Flint, Michigan and Atlanta to interview Rhoden, Baer, and Martin in November, 1986. Interviewed in the presence of Rhoden, however, Baer refused to answer any questions about Martin's alleged drug buying or selling. On the basis of his interview with Martin, GM security chief Jim Jones determined that no evidence associated Martin with buying or selling drugs in the Jacksonville facility. Jones testified that, essentially, because the matter seemed to boil down to a credibility contest between Rhoden and Martin, and because the interviews failed to substantiate any of Rhoden's allegations, GM made no further attempts to look into the basis of Rhoden's charges. (Plant Manager Bob

Another rumor concerning Martin began circulating in 1986. This time, the allegation was that Martin had sexually harassed Betty Brown, a female hourly employee at the Jacksonville facility. On May 19, 1986, Robert Roviaro, GM's Local Personnel Director and Labor Relations Representative, notified Calvin Shiver, the Regional Labor Relations Director, of the existence of the rumor. Another allegation of sexual harassment came to Shiver's attention in mid-November.[5] During this time, both Martin and GM agree that Martin repeatedly demanded of company officials on numerous occasions that investigations be made in accordance with GM's formal policies, and that hourly workers be punished for making the allegedly false claims against him. GM's position is that it never accepted or rejected the merits of Martin's claim, because it had insufficient evidence upon which to make a determination of the veracity of Martin's charges. According to GM, Calvin Shiver's investigation of sexual harassment allegations involving Martin between September and December, 1986, essentially was inconclusive.[6] In December, 1986, Shiver requested GM's Divisional Personnel Director in Flint, Michigan, to investigate the rumors of sexual harassment involving Martin. Shiver continued to investigate the allegations through at least April or May of 1987.

In January of 1987, Betty Brown and Deborah Baer filed formal sexual harassment grievances against Martin, which involved conduct that had allegedly occurred as early as May of 1986.[7] GM requested Local 323 to provide factual support for these allegations. After numerous requests, the union finally provided the supporting data to the company in April, and according to GM, Shiver immediately provided this material to Martin. Shiver requested Martin to assist him in responding to the grievances. Although Martin apparently prepared a reply, he never gave it to either his supervisors or Shiver. Soon thereafter, in May, 1987, Martin requested and took sick leave, from which he never returned. Martin was classified as totally and permanently disabled. He subsequently applied for and received a disability retirement from GM.

Like Martin, Deborah Baer also left GM in the spring of 1987, and began working for the United States Postal Service. In addition to her grievance, she filed a charge of sexual harassment with both the Jacksonville Equal Opportunity Commis-

Stone did testify that when he confronted Baer in her workplace a day or so after her interview with the GM investigators, he once again asked her to respond "yes" or "no" to the allegations of Martin's involvement in drugs; according to Stone, she responded, " 'If I were you, Mr. Stone, I would believe Mr. Martin and not Mr. Rhoden.' ")

5. Shiver acknowledged hearing vague rumors that a Jacksonville hourly employee, Marie Conn, had written to the UAW regarding sexual harassment. GM claims, however, that it was not until Shiver's receipt of a copy of Conn's letter in mid-November that he learned that sexual harassment allegations had been leveled by Conn against three supervisors, including Martin. Although no new claims were leveled against Martin, according to Shiver, a further investigation was commenced. GM claims that the supervisors were asked to assist GM in responding to the Conn letter, but Martin and another supervisor expressly refused to aid in GM's investigation.

6. The extent of GM's investigation at this point is disputed. For example, according to GM, shortly after acknowledgment of the Brown ru-

mor, Roviaro and General Foreman Donald Royston interviewed Martin and otherwise investigated the details of Brown's allegations. Because the parties' characterizations of the incident were inconsistent, and because neither party's account could be substantiated by eyewitness testimony, GM claims that it counseled but did not reprimand Martin. GM also claims that it did not reprimand employees providing information about the alleged harassment for the same reason, despite Martin's repeated requests that it do so.

Martin charges, however, that "nothing was done regarding this matter from May through September of 1986." *Appellant's Brief* at 6. Martin asserts that, contrary to GM's account above, Roviaro's notes indicate GM's knowledge of two eyewitnesses to the Brown incident, whose deposition testimony reveals that Martin had never assaulted Brown, that the union had pressured one of the witnesses to lie, and that GM had attempted to contact only one of them almost one year after the event had allegedly occurred.

7. Prior to this point, GM claims it had no knowledge at all of the existence of allegations of sexual harassment as to Baer.

sion ("JEOC") and the EEOC, naming Martin as the individual who had committed the violation.[8] The investigation of this charge was assigned, at the suggestion of Shiver, to Lovina Springer, an EEOC coordinator in GM's division office in Michigan who usually reviews such cases. She began an investigation of the claims against Martin in May, 1987.

At the conclusion of its investigations, GM was unable to determine the truth or falsity of the sexual harassment allegations against Martin. With regard to the Baer complaint, the JEOC ultimately concluded that there was no reason to believe that harassment had occurred. The EEOC accepted this finding, although by this time Martin had already filed suit against Brown and Baer.

## II. PROCEDURAL HISTORY

Martin originally filed two substantively identical but separate actions in the Circuit Court of Duval County, Florida, against Deborah Baer and Betty Brown. Both cases were removed to federal court and ultimately consolidated before the Honorable Howell Melton of the United States District Court for the Middle District of Florida. Along the way, Martin amended his complaint several times to add as named defendants Local 323 of the United Automobile Workers Union ("UAW"); Gerald Rhoden, an officer of Local 323; the International UAW; and GM. Following discovery, GM filed a Motion for Summary Judgment, to which Martin responded. While GM's motion was pending, all defendants except GM settled with Martin. On February 13, 1990, the district court entered an order granting GM's motion for summary judgment, and dismissing Martin's claims against GM. Martin filed his timely Notice of Appeal on March 9, 1990.

## III. STANDARD OF REVIEW

This is an appeal from an order granting summary judgment. Our review is plenary, and we apply the same legal standards as those that controlled the district court in determining whether summary judgment is appropriate. *Computel, Inc. v. Emery Air Freight Corp.*, 919 F.2d 678, 680 (11th Cir. 1990) (citing *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1382–83 (11th Cir.1990)); *Thrasher v. State Farm Fire & Cas. Co.*, 734 F.2d 637, 638 (11th Cir.1984)). We therefore examine the record in the light most favorable to the party opposing the motion, and resolve all reasonable doubts about the facts in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Computel*, 919 F.2d at 680; *Hoffman*, 912 F.2d at 1382–83; *Bannum, Inc. v. City of Ft. Lauderdale*, 901 F.2d 989, 996 (11th Cir.1990). If "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact," summary judgment is proper and the moving party is entitled to a judgment as a matter of law. Fed.R. Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original).

## IV. DISCUSSION

As suggested by the factual background above, the gist of Martin's suit has been that the Local UAW and the International UAW, with the assistance of other individuals also formerly named as defendants, engaged in a "smear campaign" to discredit Martin by spreading allegedly false and scandalous information about him. According to Martin, this information primarily consisted of allegations that he was homosexual, sexually promiscuous, used or sold drugs, and harassed or physically fondled female employees at GM's Jacksonville plant. Martin's claims against GM are

---

**8.** Betty Brown last worked for GM in May, 1986. She left the facility on sick leave, and was terminated when the sick leave expired.

There is no evidence that Brown ever filed an EEOC claim against Martin as the result of his alleged sexual harassment.

based upon alleged excessive publication of the rumors by GM company representatives, and upon an alleged failure of GM to take corrective action once company officials were made aware of the rumors.

Specifically, Martin sought relief from GM on three counts: Count IV, "Breach of Contract"; Count V, "Infliction of Emotional Distress"; and Count VI, "Tortious Nonfeasance and Excessive Publication of Slanderous Statements." His principal argument on appeal is that certain factual disputes surrounding these counts rendered this case inappropriate for summary disposition under Fed.R.Civ.P. 56(c). We disagree, and consider each count below.

## A. Breach of Contract

Martin's breach of contract claim against GM is rather hazily defined. Essentially, Martin attempts to establish an implied contract based upon various GM policies and procedures that appear, for example, in the company's Administrative and Personnel Manual ("the Manual").[9] Count IV of Martin's Third Amended Complaint alleges that during Martin's years of employment with GM, the company "created a situation 'instinct' with obligations." (*Third Amended Complaint*, R4–94 at 13 ¶ 62). According to Martin, GM's employment policies and practices "gave rise to enforceable contract rights in its employees," and GM violated those rights by allegedly departing from its policies and practices. *Id.* at 13 ¶¶ 63–64. The principal policy upon which Martin relies appears to be GM's policy prohibiting sexual harassment,[10] which is found in the Manual.[11] The Manual advises the Personnel

---

9. Preliminarily, GM asserts that Martin is preempted from even raising the question of implied contract by his signing of the written 1964 employment agreement that purportedly bears Martin's signature, and mentions nothing regarding GM's duty to investigate sexual harassment (or other) allegations. This issue engendered a rather lengthy choice of law discussion by the parties: GM claims that Florida law applies, and asserts that Florida law does not recognize implied employment contracts based on employer personnel policies. Martin, on the other hand, argues that Michigan law governs, and seeks to take advantage of a line of cases in that state, based on *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980), holding that explicit policy manual provisions and oral representations by employers sometimes can create "special circumstances" justifying an exception to the usual presumption of at-will employment.

The district court found that under the law of either state, Martin had failed to provide sufficient evidence to refute the validity, relevance or enforceability of the written employment agreement. We agree, but assume the point *arguendo* since we find, as discussed below, that regardless of which state's law applies, there is simply not enough evidence of any contractual duty to investigate on behalf of Martin for a jury to return a verdict in his favor.

10. Martin also cites a shop rule maintained by GM at the Jacksonville facility that prohibits the "making or publishing of false, vicious, or malicious statements concerning any employee, supervisor, the Company or its products." (R9–199 at 7). In his deposition, Martin went so far as to state that in his understanding "[a]ll documents that tell me about employee benefits, rules, regulations, GM contributory, anything

that defines anything to do with my employment at General Motors I consider part of my agreement or contract, its terminology." (R4–119 at 217).

11. The policy states, in pertinent part:

A. *General Information*

. . . .

3. Sexual harassment is a violation of the Corporation's EEO policy. All employees are expected to deal fairly and honestly with each other to ensure a work environment free of intimidation and harassment. Abuse of anyone through sexist slurs or other objectionable conduct, is offensive employe behavior. Sexual harassment also includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual matter.

. . . .

B. *Management's Responsibilities*

. . . .

3. Sexual harassment is a form of employe misconduct, therefore, Management has the responsibility to deal with sexual harassment as with any other form of employe misconduct as follows:
(a) On a case by case basis
(b) By stepping up to the problem when it occurs
(c) By objectively gathering information from the people concerned and treating it with confidentiality.
(d) By taking appropriate action which will be determined by the Manager, Personnel Director and Divisional Salaried Personnel Group.

. . . .

Department to conduct a "complete investigation" of sexual harassment claims. On the basis of this language, Martin apparently claims that an implied duty to investigate exists that runs not only to the alleged victims of harassment, but also to the persons *accused* of such harassment. Such a reading is an attenuated and unwarranted stretch of the language of GM's sexual harassment policy. Although all parties involved in a company's investigation of sexual harassment complaints obviously benefit from attempts to discover the truth surrounding such complaints, we agree with the district court that the primary emphasis of GM's sexual harassment policies and procedures is on protecting harassment *victims*. Even if some contractual duty can be implied from the language of GM's sexual harassment policies, Martin has no "standing" to invoke it; he is not the primary beneficiary of the policy.[12] Our review of the record on this point indicates that the district court was correct: Martin "has failed to demonstrate that [GM] contractually obligated itself, through its policies or otherwise, to protect the reputation of employees who are accused of sexually harassing other employ-ees." (*Order Granting Motion for Summary Judgment,* R10–212 at 8).

At least more tenable is the suggestion that perhaps some contractual duty to investigate may be implied from GM's sexual harassment policy on behalf of alleged harassment victims. Yet, if this claim is slightly more plausible, Martin's attempts to massage the language of the policy in order to paint himself as a "victim" of sexual harassment are more tortured.

The first difficulty with Martin's argument is that he never brought any sort of formal sexual harassment grievance or complaint (as indeed Betty Brown and Deborah Baer did against him) which would presumably trigger such an alleged duty on the part of GM.[13] Notwithstanding this fact, Martin attempts to argue that GM's definition of what constitutes sexual harassment is far broader than the definition outlined in the Federal Guidelines on Sexual Harassment, because it includes, for example, "[a]buse of anyone through sexist slurs." According to Martin, because all of the rumors circulating about him "were sexual in nature, by definition, General Motors' management recognized that Martin was being abused by sexist slurs." *Appellant's Brief* at 48.[14]

> C. *Handling Complaints*
> ....
> 4. The Personnel Department will conduct a complete investigation of the complaint for hourly and salary employees. The investigation is to be handled in a professional and confidential manner.
> *Appellant's Brief,* Exh. 1.

12. We do not mean to minimize the interest of Martin, if falsely accused, in clearing his name. But aside from the almost utter failure of the language of the policy to imply a duty to investigate sexual harassment claims on the alleged harasser's/Martin's behalf, we also fail to see how doing so would aid Martin in this case. GM's investigations of the sexual harassment complaints against Martin were inconclusive, and at a minimum indicated that the charges against him, if not groundless, were certainly not convincing. Thus, Martin was never determined to have done anything wrong, either by GM or the EEOC, and GM never disciplined him. In this respect, even if we assume that undiscovered evidence existed that GM should have discovered, evidence that would have completely and thoroughly exculpated Martin of the charges against him, the result from Martin's perspective would presumably be no different: GM would not have disciplined him. Any steps beyond this, such as the decision of whether and how Martin's alleged false accusers should be disciplined, would not be Martin's to dictate; indeed, the language of GM's sexual harassment policy in the section on "Corrective Action" explicitly renders the decision of how to handle or discipline employees involved in a sexual harassment situation completely within the discretion of the Personnel Department. Thus, it seems that any emotional harm incurred by Martin could not be traced causally to a breach of duty by GM *even* if there existed a duty that benefitted him and *even* if such a duty were breached (and neither of which Martin has shown).

13. Martin apparently complained on many occasions that he was being targeted by the union, and many times requested investigations by his supervisors. Nowhere, however, does the record indicate that he did so because he "had formulated the cognitive decision that *he* was being sexually harassed" within the meaning of GM's policy. *Appellant's Brief* at 46 (emphasis in original).

14. Indeed, according to Martin this includes even the allegations of sexual harassment itself, *i.e.* by being *accused* of sexual harassment he

We simply are not persuaded. The district court properly determined that Martin has "failed to demonstrate that this is a case in which the employer permitted a sexually harassing environment to exist." (*Order Granting Motion for Summary Judgment*, R10–212 at 12). To be sure, Martin has alleged much slander and defamatory conduct on the part of many parties, but even when all facts and inferences are construed in his favor, he has failed to prove that the making of the allegations at issue in this case constituted the kind of "sexist slurs," "unwelcome sexual advances, requests for sexual favors" or "other verbal or physical conduct of a sexual matter" contemplated by GM's sexual harassment policy. Even if we were to find that a contractual duty to investigate existed for alleged victims of sexual harassment, Martin has failed to show that he plausibly could be considered a victim.

None of the other policies or rules in GM's literature provide a sufficient basis for implying the kind of contractual obligation Martin seeks. Because Martin has failed to establish the existence of an element essential to his case, *see Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552, summary judgment on Martin's breach of contract claim was appropriate.

## B. *Infliction of Emotional Distress*

■ The Florida Supreme Court has recognized the tort of intentional infliction of emotional distress, but has carefully defined its contours:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

*Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278–79 (Fla.1985) (quoting Restatement (Second) of Torts, § 46 comment d (1965)). In applying this test, Florida courts apply an objective standard, which must be evaluated as a matter of law; the subjective response of a person does not control the question of whether the tort occurred. *See Ponton v. Scarfone*, 468 So.2d 1009, 1011 (Fla. 2d DCA 1985), *review denied*, 478 So.2d 54 (Fla. 1985) (citing *Metropolitan*, 467 So.2d at 278); *see also Baker v. Florida Nat'l Bank*, 559 So.2d 284, 287 (Fla. 4th DCA 1990), *review denied*, 570 So.2d 1303 (Fla. 1990) (issue of whether activities of defendant rise to required level of outrageousness to justify claim for intentional infliction of emotional distress is a legal question for court to decide as matter of law); *Scheller v. American Medical Int'l Inc.*, 502 So.2d 1268, 1271 (Fla. 4th DCA 1987), *review denied*, 513 So.2d 1060 (Fla.1987) (court must determine, in the first instance, whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery).

Martin offers no evidence of intentional conduct on the part of GM. Rather, Martin contends that GM's "willful and wanton failure to apply and enforce its policies and practices" resulted in injuries to him. (*Third Amended Complaint*, R4–94 at 15 ¶ 72). We recognize that in Florida reckless conduct may sometimes rise to the level of intentional infliction of emotional distress, *e.g.* when an action is in reckless disregard of a high degree of probability that emotional distress will follow. *See Food Fair, Inc. v. Anderson*, 382 So.2d 150, 153 (Fla. 5th DCA 1980). But even if we were to take it as true that GM had failed in some way to investigate fully the rumors and allegations involving Martin

was himself being sexually harassed. Such a reading seems to turn GM's sexual harassment policy on its head.

(and again, Martin has failed to show that GM owed any such duty to him in the first place), such a failure in this case would at most constitute mere negligence. The purported omissions of GM fall far below the level of outrageous conduct articulated by both the Florida Supreme Court and the Restatement as necessary to maintain an action for intentional infliction of emotional distress.[15] Count V of Martin's complaint therefore must fail as a matter of law, and summary judgment on this claim was also appropriate.

### C. *"Tortious Nonfeasance"*

As the district court observed, Martin apparently fashioned Count VI, his claim of "Tortious Nonfeasance," from a Florida treatise discussing the general proposition that if a duty is imposed independently of or concurrently with a contract, breach of the legal duty may be a tort. *See* (*Order Granting Motion for Summary Judgment*, R10–212 at 10 (quoting Fla.Jur.2d, Torts § 7 at 178–79)). Obviously, this claim rises or falls with Martin's implied contract claim. As discussed, because we find neither a duty owing to Martin nor a breach of an alleged duty, there is no breach of contract or actionable tort in the instant matter.

### V. CONCLUSION

The district court properly held that no genuine issues of material fact exist under Rule 56(c) requiring a trial on Martin's claims. The order granting summary judgment in favor of GM is AFFIRMED.

---

**15.** This is especially the case since, as mentioned, Martin was never discharged or disciplined by GM. Martin simply alleges a failure by GM to investigate various rumors in the complete and timely fashion that Martin asserts would have compelled GM to unequivocally and absolutely accept his side of the story with regard to all of the allegations against him.

Further, the cases cited by Martin to support a cause of action for intentional infliction, *Rogers v. Loews L'Enfant Plaza Hotel*, 526 F.Supp. 523 (D.D.C.1981) and *Ford v. Revlon, Inc.*, 153 Ariz. 38, 734 P.2d 580 (1987), even if they had some relevance under Florida law, are easily distinguishable. Both claimants in those decisions were victims of sexual harassment, which, as mentioned, is a status Martin cannot claim under the facts of this case. Moreover, as the District Court for the Middle District of Florida has recently observed, no Florida court to date has found that any plaintiff has stated a cause of action for the intentional infliction of emotional distress in the employment context. *See Miranda v. B & B Cash Grocery Stores, Inc.*, 1990 WL 107559, 1990 U.S. Dist. LEXIS 9350, at *6 (M.D.Fla.1990).