3 P.3d 1184

**Stephen SCHMITZ and Sharon Schmitz, husband and wife, Defendants, Counter-claimants–Appellants, Cross–Appellees,**

**v.**

**Daniel ASTON and Cynthia Aston, individually and as husband and wife, Plaintiffs, Counterdefendants–Appellees, Cross–Appellants.**

**No. 1 CA–CV 98–0121.**

Court of Appeals of Arizona, Division 1, Department D.

March 16, 2000.

Holloway Odegard & Sweeney, P.C. by Kevin B. Sweeney, Charles M. Callahan and Meyers Law Firm by J. Tyrrell Taber, Phoenix, for Defendants, Counterclaimants–Appellants, Cross–Appellees.

Stanley M. Slonaker, Phoenix, for Plaintiffs, Counterdefendants–Appellees, Cross–Appellants.

## OPINION

RYAN, Presiding Judge.

¶1 Stephen and Sharon Schmitz and Daniel and Cynthia Aston were neighbors. The Schmitzes came to believe that Mr. Aston had molested their daughter. They told several neighbors, who had children about the same age as their daughter, that they suspected that Mr. Aston had molested their daughter. The Astons subsequently sued for defamation, intentional infliction of emotional distress, and false light invasion of privacy. After trial, a jury awarded the Astons nearly two million dollars in damages. Through various post-trial rulings, the trial court reduced the amount of the award to about $500,000. Both sides appealed.

¶2 The Schmitzes appeal from the trial court's judgment on jury verdicts against them in the amounts of $250,000 for emotional distress and $25 nominal damages for defamation. They argue that the defamation claim should never have been submitted to the jury because the trial court found that their statements were conditionally privileged and the Astons did not prove that the Schmitzes abused the privilege. The Schmitzes also contend that the court erred in failing to vacate the $250,000 punitive damage award against Mrs. Schmitz individually. The Astons cross-appeal from the trial court's judgments as a matter of law which vacated the jury's awards of $900,000 for intentional infliction of emotional distress damages, $100,000 general damages for defamation, and $250,000 punitive damages against Mr. Schmitz. The Astons also cross-appeal from the trial court's directed verdict of their false light invasion of privacy claim.

¶3 We conclude that the trial court should not have applied a conditional privilege to the defamatory statements the Schmitzes made to their neighbors. Thus, we reject the Schmitzes' claim that the court erred in submitting the Astons' defamation claim to the jury. Also, with respect to the defamation claim, we hold that the trial court erred in vacating the jury's award of general damages. We also hold that the trial court erred in vacating the jury's award on the Astons' claim for intentional infliction of emotional distress. Instead, the court should have ordered a *remittitur*. We affirm the trial court's directed verdict on the Astons' claim for false light invasion of privacy, but for a different reason than primarily relied upon by the trial court. We further hold that sufficient evidence supports the award of punitive damages against Mrs. Schmitz, but we remand for the trial court to consider a *remittitur*. Finally, we affirm the trial court's order vacating the punitive damages against Mr. Schmitz. Therefore, we affirm in part, reverse in part, and remand for further proceedings.[1]

## I. BACKGROUND

### A. Factual History[2]

¶4 The Schmitzes and the Astons were backyard neighbors in Scottsdale. The Schmitzes have three children, Lauren, Liza, and Michael. The Astons have a daughter, Jillian. Because of their closeness in age,

---

1. We address the remaining issues raised by the parties on appeal by separate unpublished decision filed this date because they are not relevant to our analysis in this opinion. *See Fenn v. Fenn,* 174 Ariz. 84, 85, 847 P.2d 129, 130 (App.1993).

2. We are required to view the evidence in the light most favorable to the Astons. *See McFarlin v. Hall,* 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980).

Jillian and Liza were friends. In the fall of 1992, when both girls were five years old, Mrs. Schmitz and Mrs. Aston noticed changes in their children's behavior. Jillian was reluctant to play at Liza's house; Liza had begun to masturbate and become argumentative with family and friends.

¶ 5 In early February 1993, Mrs. Aston telephoned Mrs. Schmitz and expressed concerns that the girls had engaged in sexual play while together at the Aston home. Over the course of a few conversations, Mrs. Aston told Mrs. Schmitz that Jillian had said that the girls were kissing and playing "bum to bum" and "pee to pee." When Mrs. Schmitz asked Liza where she had learned these games, Liza became agitated and gave various responses, including that she had learned them from her sister's friend while at the park.

¶ 6 On February 10, 1993, Mrs. Schmitz took Liza to see her pediatrician, Dr. Ziltzer. Mrs. Schmitz gave the doctor Liza's medical history and said that she suspected that Liza had been sexually abused. Mrs. Schmitz explained that Liza had been sexually acting out, but that these activities only occurred with her friend Jillian. She told Dr. Ziltzer that she suspected Jillian's father, Dan Aston, might be the perpetrator because he had babysat the two girls alone several times and on one of these occasions he had bought Liza a tee-shirt and had given her a dollar.

¶ 7 Dr. Ziltzer asked Liza whether anyone had touched her in her private area, and Liza said "no." Liza's physical examination indicated that there was some redness in the vaginal area, but there was no evidence of trauma to the genital area, infections, or sexually transmitted diseases. Although the findings were inconclusive, Dr. Ziltzer reported that Liza's physical examination could be consistent with the suspicions of abuse described by Mrs. Schmitz. Based on Mrs. Schmitz's concerns and Liza and Jillian's inappropriate sexual play, Dr. Ziltzer made a referral to Child Protective Services ("CPS") for further investigation.

¶ 8 Dr. Ziltzer's partner, Dr. Fischler, discussed Liza's examination with Mrs. Schmitz. Because of Mrs. Schmitz's concerns and suspicions, Dr. Fischler suggested that she contact the police department and CPS. Dr. Fischler also recommended that Liza see Dr. Harrison, a psychologist who had extensive experience in treating sexually abused children.

¶ 9 Shortly thereafter, Mrs. Aston contacted Mrs. Schmitz to learn the results of Liza's examination. Mrs. Schmitz told Mrs. Aston that the doctor had found signs of molestation and that she should also take Jillian to be examined. Mrs. Aston became very upset and made repeated telephone calls to her husband, who was working out of town. That evening, Mr. Aston telephoned Mrs. Schmitz. During their conversation, Mr. Aston became extremely angry that Mrs. Schmitz thought that his daughter had also been molested.

¶ 10 On February 16, 1993, Mrs. Schmitz contacted the Scottsdale Police Department to report that Liza had been sexually molested. She told the police that the pediatrician had "confirmed" that Liza had been molested. The next day, Crisis Intervention Specialists Riccio and Perlman[3] visited the Schmitzes' home. Mrs. Schmitz explained to Riccio and Perlman that Liza had been acting out sexually with her younger brother and her friend, Jillian. Mrs. Schmitz also stated that she suspected that Mr. Aston was the perpetrator because he had babysat the two girls alone. Ms. Perlman spoke with Liza separately for approximately fifteen minutes. She avoided any direct or leading questions and primarily allowed Liza to volunteer information. However, Ms. Perlman did ask Liza if anyone had given her "bad touches." Liza responded "no." Ms. Perlman told Mrs. Schmitz that based on the interview, she had no indication that Liza had been sexually abused. Mrs. Schmitz became quite upset because she expected a more in-depth interview. She repeated her belief that Mr. Aston molested Liza.

3. Scottsdale Police Department's Crisis Intervention Specialists are not police officers. They are similar to social workers and have similar training in addition to some elementary police training. Their job is to conduct an initial inquiry in certain cases to determine if further investigation by a detective is needed.

¶ 11 About a week later, the Schmitzes met with Dr. Harrison to discuss the possibility of Liza beginning therapy sessions. Dr. Harrison had previously discussed the case with Dr. Fischler, and was aware of the examination results. During this meeting, the Schmitzes expressed their concerns about Liza's behavior, which they believed indicated that she had been sexually abused. The following day, Liza began therapy. Dr. Harrison did not ask Liza directly about any sexual abuse. Her approach was to gradually build a rapport with Liza in the hope that she would spontaneously talk about any abuse that might have occurred. Dr. Harrison asked the Schmitzes to refrain from talking to Liza about her treatment or the alleged molestation. But, Dr. Harrison told the Schmitzes they could answer any of Liza's questions.

¶ 12 Three days later, Crisis Intervention Specialist Riccio contacted the Schmitzes to follow up on their progress. Mrs. Schmitz told him that they had sought psychological care and that the doctor was eighty to ninety percent certain that Liza had been molested.[4] Mr. Riccio stated that if the doctor believed a re-interview was appropriate, one would be completed and a detective would be assigned to the case..

¶ 13 During March, Liza continued therapy. Mrs. Schmitz told Dr. Harrison that Liza was acting out and exhibiting a lot of anger at home. Dr. Harrison also observed Liza exhibit anger during their sessions. It was during these sessions that Liza began to talk about "naughty things." However, she neither volunteered any information regarding her sexual play with Jillian, nor disclosed the identity of any alleged perpetrator of sexual abuse.

¶ 14 In late March or early April, the Schmitzes began to notify some neighbors that they suspected that Liza had been sexually molested by Mr. Aston. Mrs. Schmitz primarily made the statements, which were told to four neighbors with children. At the time, none of these neighbors were friends with the Astons nor did their children play

with Jillian. Others in the neighborhood, and some of the faculty at Jillian's preschool, learned of the Schmitzes' allegations against Mr. Aston from these neighbors.

¶ 15 Later in April 1993, a neighbor told Mrs. Aston that the Schmitzes were notifying some neighbors that her husband was a child molester. During this conversation, Mrs. Aston became so distraught that she had to carry on the discussion from the ground. She was so upset that she could not care for her daughter and had to take her to a friend's house. Mrs. Aston then went to the police station and contacted Crisis Intervention Specialist Riccio. He told her that no investigation was occurring at that time.

¶ 16 In an effort to prevent the situation from escalating, Riccio telephoned Mrs. Schmitz. Mrs. Schmitz indicated that her suspicions of Mr. Aston had increased and that she was concerned for other neighborhood children. She told Riccio that she was only telling neighbors with children. Riccio warned Mrs. Schmitz that there might be legal consequences to her actions; however, Mrs. Schmitz said that out of concern for the children's safety she had to do what was right.

¶ 17 In response to the Schmitzes' statements to neighbors, the Astons circulated a letter stating that if the neighbors had any concerns they could contact Riccio for information. They also spoke with neighbors about what they viewed as the Schmitzes' false accusations. The Astons also began displaying tee-shirts around the neighborhood which contained various slogans, such as "You Named the Wrong Person." The Astons hung these tee-shirts from their backyard trees, car windows, and wore them while jogging through the neighborhood. During this time, Liza continued her therapy sessions with Dr. Harrison.

¶ 18 Apart from Liza's therapy sessions, Mrs. Schmitz had discussions with Liza about secrets and the need for children to disclose secrets about molestation. Mrs. Schmitz also read children's books to Liza that had stories

---

4. At trial, Dr. Harrison could not recall saying this and indicated that it is not her practice to give these types of percentages. She did, however, based on the reports of her parents, diagnose Liza as suffering from post-traumatic distress disorder, possibly as a result of child abuse.

about the topic of child sexual abuse and the need to disclose. Toward the end of April and the beginning of May 1993, Liza began to discuss secrets with Dr. Harrison. Liza specifically referred to her sexual play with Jillian. However, Liza still did not identify Mr. Aston as her perpetrator. In May, Dr. Harrison learned from Mrs. Schmitz that Liza's behavioral problems had increased as a result of seeing Mr. Aston jog in the neighborhood.

¶ 19 In early June, Mrs. Schmitz expressed her belief to Dr. Harrison that Liza was close to naming Mr. Aston as the perpetrator. She explained that she had read books with Liza which discussed how adults threaten children to prevent them from disclosing secrets. Mrs. Schmitz suspected that Mr. Aston might have threatened Liza, and that had been the reason for Liza's failure to identify him as the perpetrator. Three weeks later, on June 23, 1993, after four months of therapy, Liza revealed to Dr. Harrison that Mr. Aston had touched her bottom on two occasions. Dr. Harrison understood that when Liza said "bottom" she was referring to the buttocks area. Two weeks later, Liza again told Dr. Harrison that Mr. Aston had touched her, and that she was afraid of him.[5]

¶ 20 As a result of Liza's disclosure, the Scottsdale Police were again contacted. Detective Cwengros, who had extensive training in the investigation of sex crimes, was assigned the case. Cwengros received information about the pediatrician's findings and learned from Dr. Harrison that Liza had stated that she had been inappropriately touched by Mr. Aston. Cwengros interviewed Liza alone, at which time she stated that Mr. Aston had touched her under her clothing in her vaginal area. Based on Liza's demeanor and spontaneous responses, Cwengros had no reason to disbelieve her.

¶ 21 Later, Cwengros also spoke with the Astons. Having previously interviewed Liza, Cwengros focused his questioning on whether Mr. Aston had the opportunity to commit

a sexual crime against Liza. Mr. Aston admitted that on one occasion he babysat his daughter, Jillian, and her friend Liza by himself. Mr. Aston expressed embarrassment about discussing the matter, and was angry about being accused of sexual molestation. Cwengros submitted a report to the Maricopa County Attorneys' Office for a charging decision; however, he made no recommendation concerning prosecution. Mr. Aston was never charged with committing any offenses.

## B. Procedural History

¶ 22 The litigation began with the Astons filing a complaint against the Schmitzes, alleging causes of action for defamation, false light invasion of privacy, and negligent and intentional infliction of emotional distress. They also sought punitive damages. The Schmitzes counterclaimed, with causes of action for negligent and intentional infliction of emotional distress. These claims were based on two activities of the Astons. One was the Astons' display of tee-shirts around the neighborhood accusing the Schmitzes of making false accusations. The other occurred after the Schmitzes moved out of the neighborhood in August, 1993. Mr. Aston went to the Schmitzes' new home several times and parked nearby. He testified that he did this for the purpose of inflicting pain on the Schmitzes. Mrs. Schmitz saw him at least twice and became quite upset.

¶ 23 The Schmitzes filed a motion for partial summary judgment on the Astons' defamation claim contending that any conversations with law enforcement were privileged and that there was no evidence of their falsity or conscious disregard of their probable falsity. The Schmitzes also filed motions for partial summary judgment regarding the Astons' claims for punitive damages and false light invasion of privacy. The trial court granted the Schmitzes' motion for summary judgment with respect to their conversations with law enforcement finding that these conversations were "subject to qualified immunity." However, the court denied both motions

---

5. During the following nine months, Liza accused Mr. Aston of more involved sexual contact, including contact with his private parts. These revelations were all new to Dr. Harrison. But there is no evidence that these revelations were disclosed to the police or anyone else. They came to light during discovery in this lawsuit.

for summary judgment regarding the punitive damages and false light invasion of privacy claims. The case then proceeded to trial.

¶ 24 At the conclusion of the presentation of evidence, the trial court granted the Schmitzes a directed verdict on the Astons' false light invasion of privacy claim. The court found that the facts were insufficient to support this claim because there was inadequate publication. The court also found it duplicated the Astons' other claims. With respect to the defamation claim, the trial court determined that under Restatement (Second) of Torts (1977) ("Restatement") and Arizona public policy the statements the Schmitzes made to their neighbors were conditionally privileged. However, the court denied the Schmitzes' motion for a directed verdict on the Astons' punitive damages claims. Additionally, the court denied the Schmitzes' motions for judgment as a matter of law on the Astons' defamation and intentional infliction of emotional distress claims. The court also directed verdicts on both the Schmitzes' and the Astons' claims and counterclaims of negligent infliction of emotional distress, finding that neither party could show the necessary harm required to satisfy those claims.

¶ 25 The jury returned a verdict in favor of the Astons on their defamation claim, finding general damages to be $100,000 and emotional distress damages to be $250,000. The jury also returned verdicts in favor of the Astons on their intentional infliction of emotional distress claim in the amount of $900,000 and awarded punitive damages of $250,000 against Mr. Schmitz and $250,000 against Mrs. Schmitz. Finally, the jury found against the Schmitzes on their counterclaim.

¶ 26 Subsequently, the Schmitzes filed a motion for judgment as a matter of law as to the jury verdicts. The trial court granted the Schmitzes' motion with respect to the general damages award of $100,000 on the defamation claim, finding that the evidence did not demonstrate that any reputational damage occurred to the Astons. Instead, the court awarded the Astons nominal damages in the amount of $25. However, the court affirmed the jury's award of $250,000 for emotional distress for defamation, finding that enough evidence was presented to sustain this award.

¶ 27 In addition, the court granted the Schmitzes' motion for judgment as a matter of law with respect to the $900,000 award for intentional infliction of emotional distress and vacated the jury's verdict. The court stated that the purpose of an award for intentional infliction of emotional distress was to compensate, not to punish. It found that no reasonable person, under the facts in this case, could determine that the Astons suffered such emotional distress as to warrant this high of an award. The court found the award duplicative of the defamation claim and the result of the jury's anger, passion, and prejudice. The court further stated that the award shocked the conscience of the court.

¶ 28 As for punitive damages, the trial court initially upheld the jury's verdict with respect to punitive damages against both Mr. and Mrs. Schmitz separately. However, after a second set of motions was filed by the Schmitzes, the court granted judgment as a matter of law and vacated the jury's verdict of punitive damages against Mr. Schmitz. But the court refused to disturb the jury's $250,000 punitive damage verdict against Mrs. Schmitz.

## II. DISCUSSION

¶ 29 We first address the defamation claim and the issue of conditional privilege. We conclude that the trial court erred in applying a conditional privilege to the defamatory statements the Schmitzes made to the neighbors. We also conclude that the court erred in vacating the jury's award as to reputational damages for defamation.

### A. Defamation

¶ 30 Defamation is a false publication that impeaches another's honesty, integrity, virtue, or reputation or brings the defamed person into disrepute, contempt, or ridicule. See *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989). A statement is defamatory if it tends to "harm the reputation of another as

to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement § 559. A person who publishes a false and defamatory statement concerning a private person is subject to liability if he or she knows that the statement is false and that it defames the other, acts in reckless disregard of these matters, or acts negligently in failing to ascertain the truth or falsity of the statement. *See Peagler v. Phoenix Newspapers, Inc.*, 131 Ariz. 308, 311–12, 640 P.2d 1110, 1113–14 (App.1981).

¶ 31 However, under certain circumstances, a person who publishes a defamatory statement may be protected from liability if the statement is considered privileged. *See Green Acres Trust v. London*, 141 Ariz. 609, 612, 688 P.2d 617, 620 (1984); Restatement § 580B. There are two types of privileges, absolute and qualified. *See Green Acres Trust*, 141 Ariz. at 612, 688 P.2d at 620; Restatement §§ 583–612. An absolute privilege is based "upon a recognition of the necessity that certain persons, because of their special position or status, should be as free as possible from fear that their actions in that position might have an adverse effect upon their own personal interests." Restatement, Chapter 25, Topic 2, Title B, pp. 242–43; *see Green Acres Trust*, 141 Ariz. at 612, 688 P.2d at 620. The qualified or conditional privilege is based on the societal value of protecting statements made in response to a legal, moral, or social duty. *See Green Acres Trust*, 141 Ariz. at 616, 688 P.2d at 624. To overcome a conditional privilege, a plaintiff must prove by clear and convincing evidence that the defendant knew the statement was false, or acted in reckless disregard as to its truth or falsity. *See Selby v. Savard*, 134 Ariz. 222, 225, 655 P.2d 342, 345 (1982). In other words, a plaintiff must show actual malice by clear and convincing evidence. *See Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 487, 724 P.2d 562, 573 (1986).

¶ 32 The Schmitzes argue that as a matter of law the Astons' defamation claim should never have been submitted to the jury. Based on the trial court's finding of a conditional privilege, the Schmitzes argue that the

Astons failed to meet their burden to introduce evidence that the Schmitzes' statements to their neighbors were made with actual malice. They therefore contend that the court should have directed a verdict on the Astons' defamation claim. The Astons counter that the Schmitzes' statements to neighbors that Mr. Aston sexually molested Liza constituted defamation *per se*, and that the trial court erred in granting a conditional privilege to the defamatory statements made to the neighbors.

### 1. The Trial Court Erred in Applying a Conditional Privilege

¶ 33 We do not have to decide if the Astons met their burden of showing actual malice because we conclude that the trial court erred in applying a conditional privilege for three reasons. First, the Schmitzes had no duty to warn their neighbors of their suspicions. Second, the Schmitzes and their neighbors did not share a common interest to a sufficient degree to warrant application of a conditional privilege. Third, public policy does not support application of a conditional privilege here. Thus we reject the Schmitzes' argument that the trial court erred in submitting the Astons' defamation claim to the jury. Because the evidence clearly supports the verdict, we affirm the jury's award for defamation.

¶ 34 Whether a privilege exists is a question of law for the court, and whether the privilege was abused is a question for the trier of fact. *See Green Acres Trust*, 141 Ariz. at 616, 688 P.2d at 624. The trial court's classification of the privilege is a question of law that we review *de novo*. *See Ashton–Blair v. Merrill*, 187 Ariz. 315, 317, 928 P.2d 1244, 1246 (App.1996). There is no strict formula as to when a conditional privilege applies, but rather we must weigh a person's interest in reputation against society's interest in free speech and in encouraging certain beneficial communications. *See MacConnell v. Mitten*, 131 Ariz. 22, 23, 638 P.2d 689, 690 (1981). A court must examine the circumstances to determine whether the person making the defamatory statement had an obligation to speak. *See Green Acres Trust*, 141 Ariz. at 616, 688 P.2d at 624.

¶ 35 Based on Restatement section 595 and Arizona public policy, the trial court determined that the Schmitzes' statements to their neighbors were conditionally privileged.[6] The court stated that "publication to neighbors of one's good faith suspicions 'there is someone in the neighborhood that may have molested their children' . . . is of grave, social importance."

¶ 36 Whether a person is conditionally privileged in telling neighbors that another neighbor is a child molester is a question of first impression in Arizona.[7] Therefore, for guidance, we look to the Restatement, a source frequently used in defamation cases. *See Burns v. Davis*, 196 Ariz. 155, ¶ 5, 993 P.2d 1119, ¶ 5 (App.1999) (stating that in determining whether a privilege exists, Arizona courts first look to case law; however, when none exists, we look to the Restatement); *see also Sanchez v. Coxon*, 175 Ariz. 93, 95, 854 P.2d 126, 128 (1993). The Schmitzes argue that three factors justify a grant of a conditional privilege in this case: (1) protection of the interest of the recipient or third person; (2) common interest; and (3) public policy. We conclude that none of the three factors supports the application of a conditional privilege.

### a. Protection of Interest of Recipient or Third Person

¶ 37 Under Restatement section 595, a publication is conditionally privileged if "there is information that affects a sufficiently important interest of the recipient or third person" and the publisher is under a legal duty to publish the defamatory matter, or publication to the recipient "is otherwise

within the generally accepted standards of decent conduct." Restatement § 595(1)(a), (b). An important factor in determining whether a publication falls within generally accepted standards of decent conduct is if the publication is made in response to a request rather than volunteered or if a family or other relationship exists between the parties. *See* Restatement § 595(2)(a), (b). Although the privilege is clearest when the publisher has a legal duty to make the statements, courts have applied this privilege in a wide variety of fact situations, making it difficult to reduce it to any one formula. *See* W. Page Keeton et al., Prosser and Keeton on The *Law of Torts* § 115, at 826–27 (5th ed.1984). For example, the privilege has been applied to situations in which a former employer warns a prospective employer about an employee, a person notifies an insurance company that it is being swindled by an insured, a landlord is told that a tenant is undesirable, a creditor is told about its debtor's insolvency, and a person is protecting a family member by publication of allegedly defamatory information. *See id.; see also Green Acres Trust*, 141 Ariz. at 617, 688 P.2d at 625. In Arizona, this privilege has been applied to reports made by private investigators to their employer. *See Roscoe v. Schoolitz*, 105 Ariz. 310, 314–15, 464 P.2d 333, 337–38 (1970).

¶ 38 The Schmitzes assert that under Restatement section 595 their statements are privileged because the neighborhood children's safety is a sufficiently important interest. On the other hand, the Astons contend that the Schmitzes made their statements to neighbors without having any evidence that

---

6. The trial court instructed the jury that statements made to law enforcement and health care providers were absolutely privileged. This instruction was erroneous because such statements are only conditionally privileged. *See* Ariz.Rev. Stat. Ann. ("A.R.S.") § 13–3620(G)(1989). But the Astons failed to object to the instruction and they did not cross-appeal on the trial court's grant of this privilege. Thus, any argument by the Astons concerning the court's erroneous application of a conditional privilege to statements the Schmitzes made to doctors or the police is waived. *See Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 419–20, 758 P.2d 1313, 1321–22 (1988).

7. In fact, our research found only one case that addressed a similar situation. That case is *Kraemer v. Harding*, 159 Or.App. 90, 976 P.2d 1160 (1999). There, a jury found that the parents of children who rode on the school bus driven by the plaintiff falsely alleged that he molested children. Without much discussion or analysis, the court concluded that a conditional privilege applied. *See id.* at 1172. The court believed the conditional privilege was an appropriate balance "between protecting parents' rights to act to protect their children from what they consider dangerous or detrimental situations and, at the same time, protecting employees from false, defamatory statements. . . ." *Id.*

Mr. Aston had sexually abused Liza or that other children might be in danger. The Astons, also argue that the Schmitzes' statements were not requested by the neighbors but rather volunteered, and no case law conditionally privileges statements made to neighbors and non-family members which impute such an egregious crime as sexual molestation to another. While the safety of neighborhood children may be a "sufficiently important interest," we conclude that the Schmitzes were under no legal duty to warn their neighbors. We further conclude that the Schmitzes' conduct did not fall within "generally accepted standards of decent conduct."

¶ 39 Parents have a legal duty to report sexual abuse of a child in their care or custody to law enforcement or child protective services. See A.R.S. § 13–3620(A). But this statute does not impose any legal duty to report such matters to neighbors. Thus, under Restatement section 595, to justify application of a conditional privilege, the Schmitzes' conduct in making statements accusing Mr. Aston of child molestation must fall within "generally accepted standards of decent conduct."

¶ 40 We conclude that the Schmitzes' conduct did not fall within generally accepted standards of decent conduct. The defamatory statements were not made in response to a request, nor was there a familial or other similar relationship between the Schmitzes and their neighbors. The initial defamatory statements were volunteered by Mrs. Schmitz to three different neighbors. Although two neighbors did request further information, they did so only after Mrs. Schmitz triggered their inquiry by telling them or their spouses that there was a serious problem in the neighborhood.

¶ 41 The Schmitzes maintain that a "neighborhood relationship" is sufficient to support the court's grant of the privilege.

We do not agree for several reasons. First, under the facts of this case, it is difficult to discern with any reasonable certainty the limits of this neighborhood. Although this rationale for applying a conditional privilege is broad and applicable in various contexts, application of a conditional privilege based on a neighborhood relationship would create privileges in circumstances like those here, in which the relationship giving rise to the privilege is subjective rather than objective; the conditional privilege is essentially defined by the defamer and not by objective criteria. Further, relationships among neighbors often vary substantially depending upon a variety of factors. Finally, the Restatement does not expressly find a privilege under these circumstances, nor have we found any cases suggesting that a neighborhood relationship creates such a privilege.[8] Therefore, we conclude that protection of the interest of the recipient or third person basis did not support the application of a conditional privilege.

**b. Common Interest**

¶ 42 Although the trial court did not specifically apply the conditional privilege on the basis of a common interest, it did discuss the common interest of the parents in the neighborhood. The Schmitzes assert that neighbors with children in this small subdivision shared a "common interest" in protecting their children from sexual abuse, such that conditionally privileging their statements made in an effort to protect this common interest was proper. We disagree because, in the absence of the probability of imminent danger, we conclude that neighbors do not commonly depend on other neighbors to warn them that a possible child molester lives nearby.

¶ 43 Under Restatement section 596, a publication is conditionally privileged if the circumstances lead a person correctly or reasonably to believe that another is entitled to know subject matter pertaining to a shared

8. The court's conclusion in *Kraemer* that a conditional privilege existed for parents of children who rode together on the same bus was not fully explained. 976 P.2d at 1172. But, from the facts, it appears that one rationale was that this group was easily defined, namely parents of children who rode on plaintiff's bus each day. Also, the children supposedly at risk were easily ascertained and allegedly faced the same risk. Here, this community is not so easily defined. Further, none of the parents warned by the Schmitzes had children who played with Jillian Aston, nor did they regularly associate with the Astons.

common interest. This privilege has been found in situations involving members of a group with common pecuniary interests, such as associates in a business enterprise, tenants in common and co-owners of land, employees talking with other employees about the organization, and creditors discussing a common debtor. *See Green Acres Trust,* 141 Ariz. at 617, 688 P.2d at 625; Restatement § 596; W. Page Keeton et al., *supra,* § 115, at 829–30. The privilege has also been recognized in contexts of a non-pecuniary nature, such as statements between members of fraternal, religious, or charitable associations communicating about the conduct of current or prospective members. *See* W. Page Keeton et al., *supra,* § 115, at 830. "In these contexts, each participant in the association, group or organization depends on other participants to supply relevant information." *Green Acres Trust,* 141 Ariz. at 617, 688 P.2d at 625.

¶ 44 It is true that neighbors may have many common interests. For example, they can be interested in low crime rates, high property values, clean streets, and numerous other matters. These interests, however, are "not the kind of interest that gives rise to a common undertaking which compels protection from a defamation action." *Id.* at 618, 688 P.2d at 626. While these interests may be loosely shared by neighbors, they are not normally the type derived from participating in an organization with common goals and objectives. For the most part, the importance of these interests differs between neighbors. Further, in most instances, neighbors do not usually depend upon other neighbors to warn them that a suspected child molester lives in the neighborhood. While it is logical to assume that neighbors share an interest in protecting their children from sexual abuse, society as a whole also shares this same common interest.

¶ 45 Moreover, the evidence does not support the conclusion that the children in this neighborhood were in any more immediate danger than other children in the city. While the Schmitzes' initial statements were made only to a small group of neighbors, all of whom had children, most of those neighbors did not associate with the Astons, and

their children did not play with the Astons' daughter. Thus, any possible danger to neighborhood children was minimal or non-existent. Therefore, we conclude that a common interest rationale for applying a conditional privilege did not exist.

### c. Public Policy

¶ 46 Finally, the Schmitzes maintain that public policy, in the form of Arizona's reporting statute, *see* A.R.S. section 13–3620, favors protecting children from sexual abuse. They contend this public policy supports the trial court's application of a conditional privilege to statements they made to neighbors.

¶ 47 The Schmitzes are correct that public policy encourages publications made to protect children from sexual abuse. In fact, Arizona has adopted legislation designed to promote such publications, such as mandatory reporting of child sexual abuse and neglect, community notification of sex offenders, and the Internet sex offender website. *See* A.R.S. §§ 13–3620, 13–3825 to 13–3827 (Supp.1999). However, these statutes clearly specify who has the duty to make these publications, and to whom the publications are to be made. Under A.R.S. section 13–3620, persons who are responsible for the care of children, such as physicians, school personnel, social workers, peace officers, or parents, who have reasonable grounds to believe that a minor has been the victim of neglect or abuse, have a mandatory duty to immediately report this information to law enforcement or child protective services. Under A.R.S. sections 13–3825 and 13–3826, when a person convicted of a sexual offense is released from confinement, local law enforcement agencies are required to complete a risk assessment and notify the community under guidelines established by the community notification guidelines committee. Under A.R.S. section 13–3827, the Department of Public Safety is required to maintain an Internet sex offender website to provide information to the public.

¶ 48 But none of these statutes imposes on neighbors a duty to warn other neighbors that a child may have been a victim of sexual abuse or that children in the neighborhood may be at risk. Any community notification

that is required by law is undertaken by law enforcement and involves only sexual offenders whose risk has been determined to necessitate such notification. Furthermore, those sexual offenders subject to public notification laws have been convicted of a sexual offense before any notification is made to the community.

¶ 49 Although we agree that safety of children is an important societal interest, when balanced with a person's interest in not having his or her reputation damaged by unsupported allegations of sexual molestation, we believe that our decision must be in favor of protecting the reputation of the innocent person. There may be situations in which a neighbor's warning to another neighbor should be conditionally privileged. But in this situation, we think that adequate alternatives existed. The police, for example, are trained to investigate and substantiate such allegations. If, as here, the police and the prosecutor conclude that a crime did not occur, parents can still take steps to protect their children. But, when probable cause is lacking and there is no evidence of immediate danger, we believe that parents should not be conditionally privileged to tell neighbors that another neighbor is a possible molester. A parent is under no duty to warn others, and it seems to us that public policy does not warrant conditionally shielding defamatory statements under such circumstances.

¶ 50 For these reasons, we hold that the trial court erred in ruling that a conditional privilege applied to the Schmitzes' statements accusing Mr. Aston of child molestation. Thus, we reject the Schmitzes's argument that the court should have directed a verdict on the defamation claim. Accordingly, we affirm the jury's verdict on the defamation claim.

## 2. Reputation Damages for Defamation

¶ 51 The Astons argue that the trial court erred in vacating the jury's award of

$100,000 for damage to their reputations on their defamation claim and awarding only nominal damages of $25. The Astons maintain that the evidence supports the jury's original award of reputational damages. We conclude that the trial court erred in vacating the award and awarding only nominal damages because the defamation here was *per se* and, in such cases, damages are presumed.

¶ 52 In order to maintain an action for defamation, the plaintiff must prove that special harm occurred. *See* Restatement § 575. However, if the defamatory statement is actionable *per se*, injury is presumed and the plaintiff does not have to meet the burden of proving special harm in order to recover nominal or compensatory damages. *See Modla v. Parker*, 17 Ariz.App. 54, 56, 495 P.2d 494, 496 (1972); *see also* W. Page Keeton et al., *supra*, § 112, at 788. An oral statement is defamatory *per se* if it imputes the commission of crimes involving moral turpitude. *See Hansen v. Stoll*, 130 Ariz. 454, 457, 636 P.2d 1236, 1239 (App. 1981); *Roscoe*, 105 Ariz. at 312, 464 P.2d at 335; *see also* Restatement § 571(b).

¶ 53 The statements here were defamatory *per se*. *Cf. Miles v. National Enquirer, Inc.*, 38 F.Supp.2d 1226, 1229 (D.Colo.1999) (holding statements that plaintiff was a pedophile and sexual offender are defamatory *per se* ). Thus, damages were presumed. *See Hirsch v. Cooper*, 153 Ariz. 454, 457, 737 P.2d 1092, 1095 (App.1986). "Presumed damages may be awarded by juries with very little guidance as to their amount." 1 Robert D. Sack, *Sack on Defamation* § 10.3.3 (3d ed.1999). Nevertheless, presumed damages are intended to be an approximate compensation for real injury. *See id.* Although evidence supports the trial court's finding that the Astons did not suffer significant harm to their reputations,[9] such a finding is irrelevant in a defamation *per se* case. Thus, we hold that the court erred in

9. The court found that no evidence pointed to any negative impact on their reputations at work, and neither lost any memberships in clubs or other organizations. The court also found that although the Astons testified that they believed that the neighbors were avoiding them, those neighbors testified that they did not associate

with the Astons before the allegations and the allegations did not cause them to not associate with the Astons now. Also, the trial court pointed out that any harm to the Astons' reputations was more the result of "their own antics ... of parading through the neighborhood and the hanging of shirts in trees...."

vacating the award for general or reputational damages on the defamation claim. We so hold because damages for defamation *per se* are presumed, and the jury is permitted to award a reasonable sum for the presumed harm suffered. We conclude that the jury award of $100,000 was reasonable. Accordingly, we remand to the trial court with directions to reinstate the jury's award of general damages for defamation.

## B. Intentional Infliction of Emotional Distress

¶ 54 The trial court granted judgment as a matter of law in favor of the Schmitzes on the Astons' claim for intentional infliction of emotional distress. We review *de novo* a trial court's ruling with respect to judgment as a matter of law. *See Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997). We view the evidence and all reasonable inferences from the evidence in the light most favorable to the party against whom judgment was entered. *See id.* Judgment as a matter of law should be granted only if the facts have so little probative value that reasonable people could not find for the nonmoving party. *See id.;* Ariz. R. Civ. P. 50(a)(1) (providing for judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue").

¶ 55 As we understand the trial court's ruling, the court concluded that the jury's award of $900,000 on the claim for intentional infliction of emotional distress resulted from the jury's passion and prejudice and "shocked the conscience of the court." Under such circumstances, a new trial must be ordered. *See, e.g., Flieger v. Reeb*, 120 Ariz. 31, 33, 583 P.2d 1351, 1353 (App.1978). But the court did not order a new trial. Rather, it found that the award duplicated the emotional distress damages included in the defamation award. It further found that the claim for intentional infliction of emotional distress was not supported by the evidence. The court consequently vacated the jury's verdict. We conclude that the court erred in overturning the jury's verdict in its entirety and granting judgment as a matter

of law. Instead, the trial court should have ordered a new trial conditioned on a *remittitur,* because the verdict was not the result of passion and prejudice, nor was it duplicative or unsupported by any evidence.

### 1. Passion and Prejudice

¶ 56 In finding that the jury acted as a result of passion and prejudice and the $900,000 award shocked its conscience, the trial court focused primarily on the size of the award. This was error. *See Meyer v. Ricklick,* 99 Ariz. 355, 357, 409 P.2d 280, 281 (1965).

¶ 57 When the evidence justifies a damages award, the amount to be awarded is "a question peculiarly within the province of the jury, and the award will not be overturned or tampered with unless we find that the verdict was, indeed, the result of passion or prejudice." *Sheppard v. Crow–Barker–Paul No. 1 Ltd. Partnership,* 192 Ariz. 539, 549, ¶ 53, 968 P.2d 612, 622 (App.1998). A jury may be acting out of passion and prejudice when it awards an "amount so unreasonable that it 'shocks the conscience' of the court." *Id.; see also Larriva v. Widmer,* 101 Ariz. 1, 7, 415 P.2d 424, 430 (1966). But, while a verdict tainted by passion and prejudice must shock the court's conscience, not every shockingly high or low award is tainted in this way. *See Waqui v. Tanner Bros. Contracting Co.,* 121 Ariz. 323, 327, 589 P.2d 1355, 1359 (App.1979). To find passion and prejudice, there must be a showing that the jury "deliberately disregarded the facts or the instructions of the court." *Id.* at 326, 589 P.2d at 1358 (quotations omitted).

¶ 58 We cannot say on this record that the jury deliberately disregarded the facts or the court's instructions. Because the evidence supported an award of some damages to the Astons for intentional infliction of emotional distress, the jury did not disregard the facts. Similarly, the jury did not entirely disregard the court's instructions to award these damages only if they were separate from the defamation claim. Consequently, we disagree with the trial court's conclusion that the jury acted from passion or prejudice. An examination of the interplay between the torts of defamation and intentional infliction

of emotional distress and the record support our conclusion. Thus, we turn to that interplay and whether the jury disregarded the court's instruction and improperly duplicated its award of emotional distress damages.

## 2. Duplication—The Interplay Between Defamation and Intentional Infliction of Emotional Distress

¶ 59 In their complaint, the Astons sought emotional distress damages for both defamation and intentional infliction of emotional distress. Although the Astons assert that their separate intentional infliction of emotional distress claim rests partly on the Schmitzes' false statements, they contend that it also rests on separate conduct such as attempting to break up the Aston family through criminal prosecution and imprisonment, attempting to institute prosecution by implanting Liza's memory, and allowing Liza's separate cause of action against Mr. Aston to remain unresolved.[10] We conclude that when the evidence in this case is viewed in the light most favorable to the Astons, a reasonable jury could find that the Astons suffered severe emotional distress apart from that caused by the defamatory statements.

 ¶ 60 A plaintiff is not precluded from claiming damages under different torts for different injuries merely because the injuries are of the same type. *See Godbehere,* 162 Ariz. at 340, 783 P.2d at 786. But a plaintiff may not recover twice for the same injury. *See Vairo v. Clayden,* 153 Ariz. 13, 19, 734 P.2d 110, 116 (App.1987).

 ¶ 61 The torts of defamation and intentional infliction of emotional distress redress different types of wrongful conduct. Defamation protects against conduct that injures reputation, and a plaintiff may claim emotional distress damages in a cause of action for defamation if the defamatory statement caused mental suffering. *See* Restatement § 623; *e.g., Russell v. Thomson News-*

*papers, Inc.,* 842 P.2d 896, 905 (Utah 1992). On the other hand, intentional infliction of emotional distress protects against outrageous conduct that is not necessarily defamatory but causes severe emotional distress. *See* Restatement § 623 cmt. d.[11] Thus, the torts are not duplicative in and of themselves, and a plaintiff may be able to sustain causes of action for both defamation and intentional infliction of emotional distress if separate injuries result from the underlying tortious conduct. Therefore, the question before us is whether the Astons produced evidence from which a reasonable jury could conclude that they had suffered a compensable injury from severe emotional distress that was separate from the emotional distress they suffered because of the Schmitzes' defamatory statements.

¶ 62 Arizona relies on Restatement section 46(1) to define intentional infliction of emotional distress. *See Ford v. Revlon, Inc.,* 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). In order to sustain a claim for this tort, three elements must be shown:

*[F]irst,* the conduct by the defendant must be "extreme" and "outrageous"; *second,* the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct, and *third,* severe emotional distress must indeed occur as a result of defendant's conduct.

*Id.* To satisfy the element that the defendant's conduct is extreme and outrageous, the plaintiff must show that the defendant's acts were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one ... in which ... an average member of the community would ... exclaim, 'Outrageous!'" Restatement § 46 cmt. d.; *see also Revlon,* 153 Ariz. at 43, 734 P.2d at 585.

---

10. The Astons cite no authority, and we have found none, to support the proposition that refraining from filing a lawsuit can support a claim for intentional infliction of emotional distress.

11. We acknowledge that "some courts have concluded simply that '[t]his tort, ... does not lie

when the offending conduct consists only of a defamation.'" 2 *Sack on Defamation,* § 13.6 (quoting *Provencher v. CVS Pharmacy,* 145 F.3d 5, 12 (1st Cir.1998)). The Schmitzes make this argument also. But in this case, the offending conduct does not consist solely of defamation.

¶ 63 The evidence clearly supports the first two elements of the Astons' intentional infliction of emotional distress claim. The Schmitzes' conduct under these circumstances was outrageous. They also recklessly disregarded the near certainty that their conduct would cause the Astons severe emotional distress. The third element requires a showing that the Astons in fact suffered severe emotional distress different from that suffered as a result of the defamation claim. Thus, we focus our analysis on this element.

¶ 64 From the evidence, we find an important area in which the damage evidence for emotional distress in the Astons' claim for intentional infliction of emotional distress did not overlap with the Astons' defamation claim. For example, the distress caused by the fear of prosecution had nothing to do with the defamatory statements Mrs. Schmitz made to the neighbors. Crisis intervention specialist Riccio told Mrs. Schmitz that an investigation by a detective would not occur until Liza named someone. Circumstantial evidence shows that Mrs. Schmitz then began a campaign to encourage Liza to name Dan Aston as the person who molested her.

¶ 65 A jury could certainly conclude that this evidence established a reckless disregard on the part of Mrs. Schmitz that her conduct would cause extreme distress. By encouraging Liza to accuse Dan Aston of abusing her, Mrs. Schmitz created a very real threat of criminal prosecution. Consequently, Mrs. Schmitz's actions resulted in the Astons having to be subjected to an interview by Detective Cwengros. They then had to wait for the county attorney's office to decide if charges would be filed. By any measure, such events are reasonably apt to cause distress that goes beyond the normal stress of everyday life. And, such distress is separate from any emotional distress experienced from the earlier defamatory statements the Schmitzes made to the neighbors. Thus, on these facts, a rational jury could have found in favor of the Astons on their claim for intentional infliction of emotional distress and awarded damages that did not entirely duplicate the defamation claim. Accordingly, the trial court erred in granting judgment as a matter of law on the basis that the award for intentional infliction of emotional distress duplicated the award for defamation.

### 3. Sufficiency of the Evidence

¶ 66 In granting judgment as a matter of law, the trial court concluded, in part, that the verdict for intentional infliction of emotional distress was not supported by the evidence because the Astons had not shown that they suffered sufficiently extreme emotional distress. It pointed out that the Astons did not lose their jobs, move from their residence, or seek counseling. The trial court commented that intentional infliction of emotional distress "contemplates distress at such a level that would cause severe mental anguish ... or even physical injury."

¶ 67 But the Astons were not required to prove that they suffered actual physical harm. Rather, the Astons had to prove that the Schmitzes' conduct was apt to cause such a result. *See Pankratz v. Willis*, 155 Ariz. 8, 16–17, 744 P.2d 1182, 1190–91 (App.1987). A disabling response need not actually be suffered. *See id.* at 17, 744 P.2d at 1191; Restatement § 46 cmt. j.

¶ 68 The record reveals that the Astons suffered severe distress. It is difficult to imagine a worse slander than that perpetrated by Sharon Schmitz. The public shame to which it subjected the Astons, the danger of prosecution it carried, the frustration of being lied about and having to fight back against whispers, the necessity of having to resort to a lawsuit, was a calamity.

¶ 69 The record shows the extent of the Astons' suffering. Mr. Aston testified that on the very first occasion that his extremely distraught wife called him to tell him that Sharon Schmitz was saying that her daughter and the Astons' daughter had been molested, it was as if he had been hit by a bomb. When he later learned through a neighbor that he was the accused molester he described his feelings in this way:

> I hope no one else will ever have to go through this but it's the worse—I mean nothing is worse. It is hard to remember exactly. I think I was probably more de-

pressed, more embarrassed by the false accusations than anything else.

He went on to say that it made him feel worse than a murderer.

¶ 70 When the Astons went to see an attorney to discuss their options, they learned that they both could be subject to criminal prosecution and a penalty of fifteen to twenty years in prison. Mr. Aston said that this hit him like a rock and he thought his life was going to be over.[12] The Astons were advised not to discuss the case with the police without their attorney being present.

¶ 71 Mr. Aston also testified that his relationship with both his wife and his daughter was adversely affected by the episode. His wife was in such a state of anxiety that the accusations dominated their conversation. The incident was still having an adverse effect on their relationship at the time of the trial. He was so embarrassed by the incident that he did not tell his superiors at work that he was attending the trial.

¶ 72 Mrs. Aston also saw changes in her husband because of the emotional strain. Although he had once had a lot of fun doing things with their daughter, he began to fear that people would misinterpret any desire on his part to be around children and he became reluctant to go to gatherings like school functions. He also abandoned his effort to quit smoking.

¶ 73 Mrs. Aston was even more profoundly affected by the accusations than her husband. When she heard from a neighbor that Sharon Schmitz was saying that her husband was a molester and was about to be arrested, Mrs. Aston was in shock. While discussing the matter with this neighbor, she fell to her knees in apparent despair. She was so distraught that she was forced to ask a friend to care for her daughter. Yet, when she went to the police station, she was told that her husband was not under suspicion. Nevertheless, Mrs. Aston recounted that the attorney they consulted warned them about possible prosecution and she considered this the most important aspect of the situation.

Regardless of how Mr. Aston felt about the possibility of prosecution and imprisonment, a fair reading of the testimony reflects that Mrs. Aston feared for her husband in that respect.

¶ 74 In fact, Mrs. Aston's emotional distress was so pronounced that she suffered physical symptoms as well. Her pre-existing cardiac arrhythmia was aggravated to the point that she had to begin a course of medication to control it. By August 1996, she had become so distraught that she could not care for her daughter or carry on with her work as a registered nurse. She took a medical leave of absence that continued for six weeks before she could resume normal activity. For two years she was unable to deal with the stress of a normal Christmas celebration, and she wanted to do nothing but return to her hometown for the holidays.

¶ 75 From these facts, we conclude that the court erred in finding that the evidence was insufficient to support an award of damages in some amount for intentional infliction of emotional distress. A rational jury could find that the Astons suffered severe emotional distress from the fear of prosecution that went beyond the emotional distress inflicted by the defamation.

¶ 76 Accordingly, we reverse the trial court's grant of judgment as a matter of law in favor of the Schmitzes on the Astons' claim for intentional infliction of emotional distress.

### 4. Remittitur

¶ 77 Although we do not believe that the Astons' claim for intentional infliction of emotional distress duplicated the emotional distress damages for defamation, was unsupported by the evidence, or caused the jury to award damages out of passion and prejudice, we are reluctant simply to reinstate the full award. The trial court was shocked by a $900,000 award on the facts of this case, which obviously indicates that the court found the award excessive. Because it is in a better position than we to determine if a jury award is excessive, we give great weight to

---

12. Mr. Aston's testimony on this topic was inconsistent. While he said that the police investigation caused distress, in his deposition and at trial, he also testified unequivocally that he had no fear of arrest, prosecution, or imprisonment because he knew he was innocent.

its view of the matter. *See Spur Feeding Co. v. Fernandez,* 106 Ariz. 143, 149, 472 P.2d 12, 18 (1970); *Young Candy & Tobacco Co. v. Montoya,* 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962).

¶ 78 When the court finds that a jury's damage award is excessive, it may order a new trial and it may condition the new trial on the acceptance of a reduced award designated by the court—a conditional *remittitur. See* Ariz. R. Civ. P. 59(a)(5),(i). We believe that a conditional *remittitur* is appropriate in this case for several reasons. First, a rational jury could have awarded the Astons some amount of damages on their claim for intentional infliction of emotional distress. Second, as we have said, we cannot ignore the trial court's obvious dismay over the size of the amount awarded. The trial court was in the best position to determine if the jury award on this claim was excessive in some way. *Cf. Young Candy & Tobacco Co.,* 91 Ariz. at 370, 372 P.2d at 707. Finally, because emotional damages are not easily quantified, particularly by an appellate court, the trial court is in the best position to exercise discretion in fitting the jury's award to the evidence. *See Frontier Motors, Inc. v. Horrall,* 17 Ariz.App. 198, 200, 496 P.2d 624, 626 (1972). Therefore, we remand this matter to the trial court for a determination of a conditional *remittitur* under Rule 59.

### C. False Light Invasion of Privacy Claim

¶ 79 The trial court granted a directed verdict on the Astons' false light invasion of privacy claim, finding that there was insufficient publication of the allegedly false statements and that this claim duplicated the defamation claim. We review the trial court's decision under the same standard as a ruling on a judgment notwithstanding the verdict. *See Shoen,* 191 Ariz. at 65, 952 P.2d at 303. We find it unnecessary to determine if the Astons' false light invasion of privacy claim fails because of the lack of publicity. Rather, we conclude that the trial court was correct in ruling that this claim duplicated the defamation claim.

¶ 80 The tort of false light invasion of privacy is defined as follows:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement § 652E; *see also Godbehere,* 162 Ariz. at 338–40, 783 P.2d at 784–86 (recognizing the false light invasion of privacy definition in Restatement section 652E).

¶ 81 Defamation and false light invasion of privacy both involve publication; however, there is a distinction with regard to the interests that are protected and compensated by each action. *See Godbehere,* 162 Ariz. at 341, 783 P.2d at 787; *Selleck v. Globe Int'l, Inc.,* 166 Cal.App.3d 1123, 212 Cal.Rptr. 838, 846 (1985). The false light claim is designed to compensate for emotional distress, while a defamation claim is designed to compensate for harm to reputation. *See Godbehere,* 162 Ariz. at 341, 783 P.2d at 787. Although both causes of action often overlap, "[a]n injured party may seek relief through both causes of action, arising out of the same publication, but he is limited to only one recovery." *McCall v. Courier–Journal & Louisville Times Co.,* 623 S.W.2d 882, 889 (Ky.1981); *see Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084, 1090 n. 2 (5th Cir.1984); *Braun v. Flynt,* 726 F.2d 245, 250–51 (5th Cir.1984); *Dodrill v. Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840, 845 (1979); *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 448 A.2d 1317, 1329 n. 19 (1982). In cases in which both causes of action apply, "the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity." Restatement § 652E cmt. b.

¶ 82 Here, the claims were presented such that recovery for emotional distress was part of the defamation claim. As a result, the false light claim was duplicative. The Astons' defamation claim provided a

# 284

complete remedy for any damages suffered as a result of the Schmitzes' statements to neighbors. Thus, the trial court was correct to direct a verdict in favor of the Schmitzes on the Astons' false light invasion of privacy claim.

## D. Punitive Damages

¶ 83 The jury awarded punitive damages against Mr. and Mrs. Schmitz on both the defamation claim and the intentional infliction of emotional distress claim. The court later vacated the award of punitive damages against Mr. Schmitz. The Schmitzes contend that there was insufficient evidence to support a punitive damages award against Mrs. Schmitz. They also assert that the punitive damage award was excessive. The Astons argue that sufficient evidence supports an award of punitive damages against Mrs. Schmitz. They also contend that the court erred in vacating the award of punitive damages against Mr. Schmitz. We conclude that sufficient evidence supports a punitive damage award against Mrs. Schmitz, but we remand for the trial court to consider a *remittitur*. We further conclude that the trial court did not err in vacating the punitive damage award against Mr. Schmitz.

¶ 84 In deciding whether punitive damages should be awarded, we focus upon the wrongdoer's mental state. *See Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). Something more than the "mere commission of a tort" is required to recover punitive damages. *See id.; Rawlings v. Apodaca*, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986). The "plaintiff must prove that defendant's evil hand was guided by an evil mind." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. Punitive damages may only be awarded upon clear and convincing proof of a defendant's evil mind. *See Linthicum*, 150 Ariz. at 332, 723 P.2d at 681.

¶ 85 Several factors are considered when deciding whether a defendant acted with an evil mind. These factors include the following: "(1) the reprehensibility of [the] defendant's conduct and the severity of the harm likely to result, (2) any harm that has occurred, (3) the duration of the misconduct,

(4) the defendant's awareness of the harm or the risk of harm, and (5) any concealment of [the wrongful conduct]." *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132, 907 P.2d 506, 518 (App.1995). The plaintiff's burden of showing an evil mind by clear and convincing evidence may be met by either direct or circumstantial evidence. *See id.* We must affirm a jury's decision to award punitive damages if any reasonable view of the evidence satisfies the clear and convincing standard. *See Thompson v. Better–Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 557–58, 832 P.2d 203, 210–11 (1992); *Rhue v. Dawson*, 173 Ariz. 220, 232, 841 P.2d 215, 227 (App.1992).

¶ 86 We conclude that the evidence supports an award of punitive damages against Mrs. Schmitz for several reasons. First, the record shows that her conduct was reprehensible and the harm likely to result from her conduct was severe. She falsely accused Mr. Aston of a serious and abhorrent crime. This was intolerable and outrageous conduct from which a jury could infer the existence of an evil mind. *Cf. Rawlings*, 151 Ariz. at 162–63, 726 P.2d at 578–79. This false accusation subjected Mr. Aston not only to the possibility of criminal prosecution but also to damaging gossip among the neighbors. That Mrs. Schmitz initially couched her accusations as suspicions does not lead to a conclusion that the jury erred in finding the requisite evil mind. The record clearly shows evidence from which a jury could conclude that Mrs. Schmitz jumped to conclusions with no factual support, and then repeatedly lied about the findings of the pediatrician and the psychologist to the neighbors and the police. Such evidence supports a determination that her conduct was reprehensible and that severe harm could have resulted from this conduct.

¶ 87 Second, a jury certainly could have concluded that substantial harm occurred here. Mrs. Schmitz's false accusations spread throughout the neighborhood. Also, the school that Jillian Aston attended was notified that Mr. Aston was a possible child molester. Further, the police were called twice. The second call resulted in a sex

crimes detective being assigned to the case. This latter call led to the Astons' being subjected to an interview and a referral of the matter to the county attorney's office for the possible filing of criminal charges. A jury could reasonably find that these facts caused the Astons to suffer significant emotional distress. Such evidence supports the jury's conclusion that the Astons suffered substantial harm.

¶ 88 Third, a jury could have found that the duration of the conduct warranted an award of punitive damages. Mrs. Schmitz began accusing Mr. Aston of molesting her daughter in February 1993. These accusations were made in the face of inconclusive findings by the pediatrician and Liza's consistent denials that anything had happened. Mrs. Schmitz recounted these unsupported allegations to the neighbors in late March and early April. Moreover, despite the psychologist's orders not to discuss this matter with Liza, circumstantial evidence shows that over a period of about two to three months Mrs. Schmitz coached Liza to accuse Mr. Aston. Liza finally "disclosed" that Mr. Aston inappropriately touched her after four months of therapy. Thus, a jury could have found that Mrs. Schmitz's misconduct occurred over at least a four month period and could reasonably have concluded that great harm occurred even in this relatively short time.

¶ 89 Fourth, the jury certainly could have found that Mrs. Schmitz was aware of the risk of harm. A neighbor, Lincoln Hayes, warned her that her accusations would become public. Also, she was warned by Crisis Intervention Specialist Riccio that she might have to answer someday for her actions. The evidence therefore supports a finding by the jury that Mrs. Schmitz was aware of the risk of harm from her misconduct.

¶ 90 Finally, there is evidence from which a jury could infer that Mrs. Schmitz tried to conceal the extent of her wrongdoing. At trial, there were several instances in which the jury could have concluded Mrs. Schmitz lied. For example, Mrs. Schmitz denied that she encouraged a neighbor to tell teachers at Jillian Aston's school that Mr. Aston was a possible child molester. However, this neighbor testified to the contrary. Mrs. Schmitz also denied ever telling anyone from the police department that she thought Mr. Aston was a child molester. She also denied telling the police that her child had drawn a picture which the psychologist thought indicated child molestation. Both of these denials were contradicted by the police reports. We believe that a jury could find that this evidence showed that Mrs. Schmitz was willing to lie to conceal her misconduct and thus possessed the requisite evil mind to support punitive damages.

 ¶ 91 Although the evidence supports an award of punitive damages against Mrs. Schmitz, our analysis does not end there. The Schmitzes argue that the punitive damage award is excessive and that due process requires that we review whether the jury's award was excessive relative to their net worth. The Astons argue that the Schmitzes waived their due process argument. We disagree. The Schmitzes did not waive their argument that the punitive damage award was excessive. They presented evidence of their net worth during post-verdict proceedings. *See Hyatt Regency Phoenix Hotel Co.,* 184 Ariz. at 133, 907 P.2d at 519 (citing *Honda Motor Co. v. Oberg,* 512 U.S. 415, 432, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) for the proposition that "[d]ue process requires reasonable restraints on a jury's discretion to impose punitive damages, including post-verdict judicial review to ensure that the award is not excessive.").

¶ 92 Part of the post-verdict review includes an examination by this court using criteria similar to those set forth in *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 21–22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). *See Hyatt Regency Phoenix Hotel Co.,* 184 Ariz. at 134–35, 907 P.2d at 520–21. These criteria include the following:

(1) the proportionality of the award to the wrongdoer's financial position to ensure that the goals of punishment and deterrence are served without financially devastating the defendant; (2) the reprehensibility of the defendant's conduct, including the duration of the misconduct, the defendant's awareness of the risk of harm, and

any concealment; and (3) the profitability to the defendant of the wrongful conduct. *Id.* (citing *Hawkins v. Allstate Ins. Co.,* 152 Ariz. 490, 497–502, 733 P.2d 1073, 1080–85 (1987)). For several reasons we conclude that the award as it now stands is excessive and the trial court therefore should consider a *remittitur.*

¶ 93 First, the award is disproportionate to the Schmitzes' financial position and would financially devastate them. It is uncontroverted that $250,000 is nearly double the Schmitzes' net worth. A lesser amount will ensure that the goals of punishment and deterrence are served. Second, Mrs. Schmitz did not profit from her misconduct. To the contrary, nearly all the witnesses testified that her sole motivation appeared to be to protect the neighborhood children. No other explanation was offered for her wrongful conduct. Third, when the trial court ruled on the appropriateness of punitive damages against Mrs. Schmitz, it had previously struck the jury's award of damages to reputation under the defamation claim, and had vacated the intentional infliction of emotional distress claim in its entirety. But now the equation is considerably changed. We have reinstated the jury's award for reputational damages on the defamation claim and reinstated the jury's finding for the Astons on their intentional infliction of emotional distress claim, but remanded that claim for a *remittitur.* Given this change in the equation, and the uncontroverted evidence that a $250,000 punitive damage award would financially devastate the Schmitzes, we hold that the punitive damage award is excessive. Accordingly, the award for punitive damages against Mrs. Schmitz is remanded for consideration of a *remittitur* by the trial court.

¶ 94 As for the award of punitive damages against Mr. Schmitz, later vacated by the trial court, there is absolutely no evidence to support such an award. He spoke to only one neighbor, who had to pry the information from Mr. Schmitz. No other neighbor or witness testified that Mr. Schmitz told them anything about this situation. The Astons do not present any reasonable argument to justify reversing the trial court's order vacating this award. Their argument seems to rest on the assumption that Mr. Schmitz adopted his wife's statements and that he should have somehow controlled and prevented her from talking to the neighbors. This evidence does not support an award of punitive damages. Thus, we conclude that the trial court was correct in vacating the jury verdict imposing punitive damages against Mr. Schmitz.

## III. CONCLUSION

¶ 95 This matter is remanded for further proceedings consistent with this opinion.

CONCURRING: RUDOLPH J. GERBER, Judge, and THOMAS C. KLEINSCHMIDT, Judge.

**NOTE:** The Honorable Thomas C. Kleinschmidt, Retired, is authorized to participate in this appeal by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 20 and Administrative Order No. 2000–15.